# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2025

Lyle W. Cayce
Clerk

No. 15-31114

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

THOMAS STEVEN SANDERS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:10-CR-351-1

Before RICHMAN, SOUTHWICK, and OLDHAM, *Circuit Judges*.

PRISCILLA RICHMAN, *Circuit Judge*:

Thomas Steven Sanders was convicted of kidnapping and murdering a twelve-year-old child and received two concurrent sentences of death. In this direct criminal appeal, Sanders brings numerous challenges to his convictions and sentences. On December 23, 2024, then-President Biden commuted Sanders's sentences to two terms of life imprisonment without

No. 15-31114

the possibility of parole.[1]  That action did not necessarily moot the issues Sanders has raised in his appeal.  We now vacate Sanders's conviction and sentence under Count Two of his indictment, which was based on 18 U.S.C. § 924(c) and (j), and we otherwise affirm the district court's judgment.

## I

In 2010, Suellen Roberts and her twelve-year-old daughter, L.R., moved in with Suellen's mother, who lived in a one-bedroom apartment in Las Vegas.[2]  Suellen rented a storage unit at Pacific Mini-Storage to store some of her belongings.[3]  Sanders worked and lived at the Pacific Mini-Storage facility, and it was there that Suellen met Sanders.[4]  During the summer of 2010, Suellen visited the storage facility two or three times a week.[5]  Sanders and Suellen began dating and would often go out together.[6]  Late that summer, the two started planning a Labor Day weekend trip to Arizona with L.R.[7]  Shortly before the trip, Sanders purchased ammunition

---

[1] *See Commutations Granted by President Jospeh Biden (2021-2025)*, Off. of the Pardon Att'y (Feb. 21, 2025), https://www.justice.gov/pardon/commutations-granted-president-joseph-biden-2021-present [https://perma.cc/2EJ5-59T3] (last visited Mar. 27, 2025); *FACT SHEET: President Biden Commutes the Sentences of 37 Individuals on Death Row*, The White House (Dec. 23, 2024), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/12/23/fact-sheet-president-biden-commutes-the-sentences-of-37-individuals-on-death-row/ [https://perma.cc/9UJN-VDDS] (last visited Mar. 27, 2025).

[2] ROA.2249, 2253.

[3] ROA.2253-54.

[4] ROA.2255-56, 2284-85.

[5] ROA.2256-57.

[6] ROA.2257, 3192.

[7] ROA.2259-60, 2264.

for a .22 caliber rifle.[8]  The three left Las Vegas in Suellen's vehicle and visited various attractions in Arizona over the Labor Day weekend.[9]  On Monday, they began their trip home to Las Vegas.[10]  In response to questioning, Sanders provided the following account.  En route, they were driving "down the road and found a place to go shooting the gun."[11]  Suellen was "learn[ing] how to shoot his .22" rifle.[12]  After Sanders and Suellen had been shooting the rifle, Sanders fatally shot Suellen in the head at close range and left her body where they had been shooting.[13]  There is no evidence of an argument or altercation prior to the shooting.[14]  L.R. witnessed Sanders shoot her mother and "was in hysterics."[15]  Sanders then drove with L.R. for three or four days to Louisiana.[16]  Sanders stopped in a remote area that was not far from his childhood home,[17] and he fatally shot L.R. four times in the head and chest before slitting her throat.[18]  Sanders left L.R.'s body in the woods.  The

---

[8] ROA.2278-82, 2290-91.

[9] ROA.2264-65.

[10] ROA.5657.

[11] ROA.5657.

[12] ROA.2143.

[13] ROA.2143.

[14] ROA.5659.

[15] ROA.2143-44, 2179.

[16] ROA.2144.

[17] ROA.2144, 2780-81.

[18] ROA.2144.

record reflects that approximately a month later, hunters discovered L.R.'s remains.[19]

In the meantime, Suellen's family notified authorities that Suellen and L.R. were missing after they did not return home to Las Vegas.[20] Subsequently, on November 14, 2010, the authorities apprehended Sanders,[21] and he confessed to killing both Suellen and L.R.[22]

Sanders was prosecuted by federal authorities under federal law. In 2014, after a four-day trial in the Western District of Louisiana, a jury convicted Sanders of kidnapping and murdering twelve-year-old L.R.[23] After a seven-day penalty phase trial, the jury determined "by unanimous vote that a sentence of death shall be imposed" on both counts.[24] Pursuant to the jury's verdict, the district court imposed two concurrent death sentences.[25] This direct appeal follows in which Sanders presents several issues.

## II

Sanders first argues that the district court erred by failing to order a hearing sua sponte to determine whether he was competent to stand trial.[26]

---

[19] ROA.2035-36.

[20] ROA.2269.

[21] ROA.2151.

[22] ROA.2143.

[23] ROA.1386.

[24] ROA.3466-67.

[25] ROA.3471.

[26] Sanders Br. at 33.

No. 15-31114

"An abuse of discretion standard applies to the district court's failure to sua sponte conduct a mental competency hearing."[27]

Pursuant to 18 U.S.C. § 4241(a), a district court shall order a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."[28] "There is no specific threshold or 'quantum of evidence' that requires the district court to order a competency hearing."[29] To determine whether the district court should have ordered a hearing, we consider the following factors: "(1) the existence of a history of irrational behavior, (2) the defendant's demeanor at trial, and (3) prior medical opinion on competency."[30]

In arguing that he had a history of irrational behavior, Sanders relies heavily on the fact that defense counsel made an ex parte proffer before the district court prior to the commencement of opening statements. During this proffer, counsel stated that they had "always been able to maintain a semblance of competency with our client. However, recently with voir dire and the stresses of trial, he is decompensating."[31] Significantly, during this proffer, counsel did not provide the court any examples of Sanders's statements or behavior that led counsel to believe that Sanders might be

---

[27] *United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012) (italics omitted).

[28] 18 U.S.C. § 4241(a).

[29] *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013) (quoting *Davis v. Alabama*, 545 F.2d 460, 464 (5th Cir. 1977)).

[30] *Id.* (quoting *United States v. Ruston*, 565 F.3d 892, 902 (5th Cir. 2009)).

[31] ROA.5550 (italics omitted).

incompetent to stand trial.[32] Counsel then informed the court that "if those concerns grow even further, we'll certainly alert the court again."[33] Additionally, counsel stated to the court that their expert anticipated that Sanders's condition would worsen during trial.[34] After that proffer, counsel did not bring to the court's attention any further concerns regarding Sanders's competency.[35]

Sanders also relies on evidence introduced at trial that he suffered from mental illnesses and brain damage. This court has explained that "'the presence or absence of mental illness or brain disorder is not dispositive' as to competency."[36] Put another way, a "defendant can be both mentally ill and competent to stand trial."[37] In responding to a verdict form submitted during the penalty phase, the jury unanimously found, by a preponderance of the evidence, that Sanders had brain damage but also unanimously failed to find that he suffered from mental illness.[38] Nonetheless, Sanders's psychiatrist, Dr. Stewart, testified that he diagnosed Sanders with

---

[32] *Cf. United States v. Williams*, 998 F.2d 258, 266 (5th Cir. 1993) (citing *Lewellyng v. United States*, 320 F.2d 104 (5th Cir. 1963)) (explaining that the "allegations were factually specific, and suggested reason to believe that the defendant might be seriously mentally compromised").

[33] ROA.5551.

[34] ROA.5550.

[35] *Cf. Medina v. California*, 505 U.S. 437, 450 (1992) (stating that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense").

[36] *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013) (quoting *Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000)).

[37] *Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014).

[38] ROA.1616.

schizoaffective disorder, with a qualifier of bipolar type.[39]  Dr. Stewart also testified that Sanders had delusions of being visited by dead people and communicating telepathically;[40] however, the jury unanimously found that Sanders did not experience delusions or hear "voices that others do not."[41] Sanders claims a long history of irrational behavior based on his living in disorder in a storage facility, poor hygiene, and substance abuse.[42]  We note there was no evidence of substance abuse at the time of trial.  Indeed, during his interrogation, Sanders told the officers that he had not "taken any kind of drugs for six months prior" to killing L.R.[43]  Our analysis in *United States v. Mitchell*[44] suggests that these behaviors, standing alone, do not constitute reasonable cause to believe Sanders may have been incompetent.[45]  In that case, we concluded that the district court did not abuse its discretion by failing to conduct a competency hearing despite the fact that the defendant had been in and out of mental health facilities; had made "illogical and rambling statements" during the proceeding at issue; had been diagnosed with schizophrenic disorder, bipolar type with psychotic features; and had earlier been found not guilty of murder by reason of insanity.[46]  Sanders points out that in *Mitchell*, unlike the instant case, the defendant's testimony demonstrated his awareness and understanding of the proceedings.[47]

---

[39] ROA.3030.

[40] ROA.3015.

[41] ROA.1616.

[42] Sanders Br. at 42; Sanders Reply Br. at 4.

[43] ROA.1684.

[44] 709 F.3d 436 (5th Cir. 2013).

[45] *Id.* at 440-41.

[46] *Id.* at 438-39, 441.

[47] Sanders Reply Br. at 5 (citing *Mitchell*, 709 F.3d at 441).

Although Sanders did not testify, as explained more fully below, we are unpersuaded that this factor, by itself, demonstrates that the district court abused its discretion when it did not conduct a competency hearing.

With respect to the second factor—Sanders's demeanor at trial—there is no record evidence of any outbursts or inappropriate behavior at trial that would suggest Sanders was incompetent. The district court was able to observe Sanders's demeanor in court during jury selection, the guilt/innocence phase of trial, and the penalty phase, all of which occurred over a period of nineteen days. This factor weighs in favor of the district court's decision.

The third factor is prior medical opinions on competency. Sanders's counsel did not request that Sanders be evaluated specifically for competency to stand trial. However, Sanders was examined by four experts: the defense's psychiatrist and neuropsychologist and the government's psychiatrist and neuropsychologist. Although the government and defense experts agreed that Sanders had brain damage (but did not agree as to the severity of the damage), no expert opined that Sanders was incompetent to stand trial.[48] The government's psychiatrist, Dr. Thompson, testified that Sanders appeared "pretty competent to me and able to tell me the story that he related."[49] Dr. Thompson also testified that when he observed Sanders in the courtroom, Sanders appeared to be listening to the proceedings and occasionally speaking to his lawyer at times when it was important.[50] Accordingly, this factor weighs in favor of the district court's decision.

---

[48] *See* Oral Argument at 5:57-6:09, https://www.ca5.uscourts.gov/OralArgRecordings/15/15-31114_3-2-2020.mp3.

[49] ROA.3322.

[50] ROA.3322.

No. 15-31114

We have explained that the "trial court is in the best position to decide whether a competency hearing is necessary."[51]    Moreover, "[w]hether reasonable cause exist[ed] to put the court on notice that the defendant might be mentally incompetent is left to the sound discretion of the district court."[52]    Here, counsel represented to the court during the pre-trial proffer that they would inform the court if they had further concerns about Sanders's competency.  No further concerns were relayed to the court, and the district court was able to observe Sanders for nineteen days.  None of the four experts who examined Sanders testified that it was their opinion that he was incompetent to stand trial, and one of those experts opined that he seemed competent.    After considering the evidence and the three factors, we conclude that the district court did not abuse its sound discretion when it did not sua sponte order a competency hearing.

## III

Sanders contends that the district court erred in denying his motion to suppress the statements that he made during custodial interrogation following his arrest.  He argues that the law enforcement officers should have stopped questioning him when he invoked his right to counsel.[53]  Sanders's briefing seems to focus on the penalty phase of his trial to the exclusion of the guilt/innocence phase.  The commutation of his death sentences would seem to moot his complaints about the admission of the evidence that is in contention.  But, out of an abundance of caution, because he did not clearly forfeit or affirmatively waive the applicability of his arguments to his

---

[51] *Mitchell*, 709 F.3d at 440.

[52] *Id.* (alteration in original) (quoting *United States v. Davis*, 61 F.3d 291, 304 (5th Cir. 1995)).

[53] Sanders Br. at 56.

9

convictions, as opposed to his sentences, and because he affirmatively seeks to have his convictions reversed, we proceed to address the denial of his motion to suppress.  In evaluating the denial of that motion, we review the district court's legal conclusions de novo and its factual findings for clear error.[54]  "We view the evidence in the light most favorable to the party that prevailed below."[55]

On the day Sanders was apprehended at a truck stop, law enforcement officers questioned him three separate times.  The first time, he was questioned immediately after he was arrested when he was placed in a parked FBI vehicle.[56]  The second time, he was questioned at the FBI office after he was processed.[57]  The third time, he was questioned at a correctional facility.[58]  It is undisputed that the officers advised Sanders of his rights and that he signed a form waiving those rights.[59]  It is also undisputed that during the first and third interviews, Sanders stated that he wanted to speak to an attorney.  The parties dispute whether the invocations of counsel were limited or ambiguous.

"If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him."[60]  However, "if the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement

---

[54] *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002).

[55] *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010).

[56] ROA.1676.

[57] ROA.1710-11.

[58] ROA.1737-38.

[59] Sanders Br. at 59.

[60] *Davis v. United States*, 512 U.S. 452, 458 (1994).

obtained from him during interrogation thereafter may not be admitted against him at his trial."[61]  The question of whether a suspect has in fact invoked his right to counsel is an objective inquiry.[62]  A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[63]  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning."[64]  Further, if a suspect clearly invokes his rights as to certain topics, the officer must honor the request by changing the subject.[65]

Sanders filed a pretrial motion to suppress all his statements *except* for his admission that "I killed her [Suellen Roberts], I killed them both."[66]  The magistrate judge conducted an evidentiary hearing on the motion to suppress all other statements in the three interviews.[67]  At the hearing, FBI Special Agent Glen Kelly testified that he questioned Sanders in the FBI vehicle.[68]  This first interview in the vehicle was not recorded.  After Kelly asked Sanders for Suellen's location, Sanders replied that she was dead and that he

---

[61] *Fare v. Michael C.*, 442 U.S. 707, 709 (1979).

[62] *Davis*, 512 U.S. at 459.

[63] *Id.*

[64] *Id.*

[65] *See United States v. Ivy*, 929 F.2d 147, 152-53 (5th Cir. 1991).

[66] Sanders Br. at 56.

[67] ROA.1668.

[68] ROA.1676.

had killed both Suellen and L.R.[69]  When Kelly asked Sanders why he killed Suellen, Sanders replied that "he wanted to speak to an attorney before answering that question."[70]  Kelly testified that he changed the subject and did not repeat the question.[71]  Sanders said that on Labor Day weekend, he, Suellen, and L.R. were returning from an amusement park in Arizona and driving on Interstate 20.[72]  Sanders drove to a remote area off the highway so they could shoot his .22 rifle.[73]  Sanders admitted shooting Suellen once in the head and leaving her body there.[74]  He said L.R. witnessed him shooting her mother.[75]  Sanders drove L.R. on a several-day trip to Louisiana.[76]  Sanders denied abusing or raping L.R.[77]  When Kelly asked Sanders why he killed L.R., Sanders stated that he wanted to speak to an attorney "before answering that question."[78]  Because that was the second time that Sanders had stated he wanted a lawyer before answering a particular question, Kelly asked Sanders if he was "willing to answer all these other questions," and Sanders responded affirmatively.[79]  Kelly then changed the subject and did not again ask why Sanders had killed L.R.[80]  Additionally, when Kelly asked

---

[69] ROA.1682.

[70] ROA.1682.

[71] ROA.1682.

[72] ROA.1682.

[73] ROA.1683.

[74] ROA.1683.

[75] ROA.1683.

[76] ROA.1684.

[77] ROA.1684.

[78] ROA.1684.

[79] ROA.1685.

[80] ROA.1685.

Sanders what he did in Las Vegas, Sanders stated that he wanted to speak to a lawyer before answering that question.[81]  Kelly did not repeat that question.[82]  Kelly ended the interview by asking Sanders if he had ever killed anyone else, and Sanders replied that he had not.[83]  Sanders was then transported to the FBI office to be processed into the system.[84]

The next witness to testify at the suppression hearing was Ron Werby, a criminal investigator with the Sheriff's Department in Gulfport, Mississippi, who had been assigned to the FBI Joint Task Force for several years.[85]  Werby testified that he was in the FBI vehicle while Kelly was interviewing Sanders.[86]  Werby testified that Kelly told Sanders: "[I]f you want an attorney, you don't want to talk anymore, we'll stop the conversation right now."[87]  Sanders responded: "No, I'll answer your questions.  I just want to talk to an attorney about answering this one question as to why I killed [L.R.]"[88]  Toward the end of Kelly's interview, Werby asked Sanders where Suellen's body was located.[89]  Sanders replied that it was off "Interstate 20

---

[81] ROA.1685-86.

[82] ROA.1686.

[83] ROA.1686.

[84] ROA.1686.

[85] ROA.1702.

[86] ROA.1707.

[87] ROA.1729.

[88] ROA.1729.

[89] ROA.1708.

and about 20 miles to the west of Williams, Arizona."[90]  Sanders did not recall the exit on Interstate 20.[91]

Once the interview in the vehicle concluded, FBI Special Agent Steve Callender drove Sanders and Werby to the FBI office.[92]  While the agents processed Sanders, Werby opened a map on the computer that showed Williams, Arizona, and the surrounding area.[93]  This second interview at the FBI office was not recorded.  Werby testified that Sanders "was very interested in trying to help us find the body."[94]  After Sanders was processed, he sat down at Werby's computer, and Werby asked Sanders if he understood his rights.[95]  Sanders responded affirmatively.[96]  Werby testified that Sanders "was very willing" to look at the map and help locate Suellen's body.[97]  Sanders told Werby that the intersection off the interstate had a pile of asphalt.[98]  To help them in locating Suellen's body, Werby called Special Agent Jamie Newton, who worked in Flagstaff, Arizona.[99]  Both Werby and Sanders talked to Agent Newton.  At one point, Sanders asked Werby about L.R.'s body.[100]  Werby described the condition of L.R.'s remains, and

---

[90] ROA.1708.

[91] ROA.1708.

[92] ROA.1709.

[93] ROA.1710.

[94] ROA.1710.

[95] ROA.1712.

[96] ROA.1712.

[97] ROA.1712.

[98] ROA.1713.

[99] ROA.1713.

[100] ROA.1715-16.

Sanders became "very upset and started crying."[101] Sanders said that "she didn't deserve that."[102] Sanders told Werby that L.R. became hysterical after he killed her mother.[103] Sanders also told Werby that the gun he used to kill them "was a piece of junk" and that he had to put a bullet in the gun's chamber every time he fired it.[104] Werby testified that they were unable to find the exact exit on the interstate.[105] Werby also testified that Sanders never requested to speak to an attorney while they were at the FBI office.[106] Sanders was later transported to a correctional facility.[107]

The next witness at the hearing was Louisiana State Trooper William Moore, who had been assigned to an FBI Task Force to investigate violent crimes.[108] Moore testified that FBI Special Agent Ben Walsh called and informed him that Sanders had been arrested.[109] Moore and Walsh drove to a correctional facility in Mississippi to interview Sanders.[110] Moore had been in communication with the Gulfport FBI agents and learned that Sanders had been cooperative during his interview earlier that morning and had confessed to the murders.[111] Moore testified that the purpose of their

---

[101] ROA.1716.

[102] ROA.1716.

[103] ROA.1716.

[104] ROA.1717.

[105] ROA.1715.

[106] ROA.1725.

[107] ROA.1717.

[108] ROA.1735.

[109] ROA.1735-36.

[110] ROA.1736.

[111] ROA.1736-37.

interview with Sanders was to locate Suellen's body.[112]  Prior to interviewing Sanders, Moore testified that they advised him of his rights with a form.[113] Although Moore was aware that Sanders had waived his rights before the previous interview, they wanted to make sure Sanders understood his rights. Sanders acknowledged that he understood his rights and that he waived them.[114]  The form provided that Sanders had a right to stop the questioning and the right to talk to a lawyer before any questioning.[115]  Sanders signed the waiver form, with Moore and Walsh as witnesses.[116]  Sanders agreed to talk with Moore and Walsh and did not indicate any reservations in doing so.[117] Moore testified that Sanders was coherent and cooperative.[118]  Unlike the previous two interviews, this interview was recorded, and Sanders was aware of the recording.[119]

The interview lasted about an hour and five minutes, and the "first three-quarters of the time" involved Sanders relaying information over the telephone to agents in Arizona in an attempt to locate Suellen's body.[120] Moore testified that they used a computer to view maps, and Walsh used

---

[112] ROA.1738.

[113] ROA.1738-39.

[114] ROA.1739.

[115] ROA.1741.

[116] ROA.1740.

[117] ROA.1741.

[118] ROA.1743.

[119] ROA.1743-44.

[120] ROA.1748.

Google Maps on his cell phone.[121]  Sanders drew a picture of the area around the interstate exit to assist in finding it.[122]

At around the forty-eight-minute mark of the recording, the phone call with the Arizona agents was terminated.[123]  Moore and Walsh began questioning Sanders about the events that occurred over Labor Day weekend.[124]  Walsh then asked Sanders about his employment at a mattress factory, and Sanders responded that he wanted to speak to an attorney.[125]  As a result, Walsh changed the subject of the interview.[126]  At that point in Moore's testimony during the suppression hearing, defense counsel objected to any more questions regarding the interview, asserting that the transcript was the best evidence of the interview.[127]  The magistrate judge agreed and played the recorded interview in open court.[128]  A transcript of the recorded interview was also admitted into evidence under seal.[129]

The magistrate judge subsequently issued a report and recommendation denying the motion to suppress the statements.[130]  With respect to the first interview conducted by Agent Kelly, the magistrate judge found that Sanders asked for an attorney before he would answer three

---

[121] ROA.1749.

[122] ROA.1750.

[123] ROA.1753.

[124] ROA.1753.

[125] ROA.1754.

[126] ROA.1754.

[127] ROA.1754.

[128] ROA.1754-55.

[129] ROA.1746.

[130] ROA.198-206.

"specific questions: 1) why he killed Suellen, 2) why he killed [L.R.], 3) what he had been doing while in Nevada."[131]  The magistrate judge further found that each time that Sanders requested to talk to an attorney before answering a particular question, Kelly honored his request by changing the subject.[132]  The magistrate judge expressly rejected Sanders's assertion that the agent used the guise of clarification to persuade Sanders to continue to waive his rights.[133]  The magistrate judge found that "Agent Kelly was bending over backwards to protect Sanders's rights and to be absolutely sure that Sanders wanted to continue talking about other things."[134]  Moreover, the magistrate judge found that these "facts were corroborated by Investigator Werby."[135]  The magistrate judge concluded as follows:

> Therefore, I find, by a preponderance of the evidence, that each statement by Sanders that he wished to speak with a lawyer before answering that particular question was unambiguously directed to those particular questions only and that Sanders was not requesting an attorney before continuing with the interview.  Sanders was very clear and specific in indicating what areas of the interview he would and would not discuss without a lawyer and there is no question in my mind that his actions and choices were knowing and voluntary.[136]

---

[131] ROA.204.

[132] ROA.204.

[133] ROA.205.

[134] ROA.205.

[135] ROA.205.

[136] ROA.205.

No. 15-31114

The district court determined that the findings in the magistrate judge's report were correct and denied the motion to suppress.[137]

As an initial matter, Sanders argues that because the first interview was not recorded, we should assess Kelly's and Werby's testimony in light of the subsequent recorded interview.[138] Although pre-invocation conduct is a relevant consideration when evaluating whether an invocation was clear and unambiguous,[139] we are not persuaded that a subsequent interview conducted by different law enforcement officers is relevant. The magistrate judge "was in the best position to weigh the credibility of the testimony" of Kelly and Werby.[140] Accordingly, we "will not second guess the district court's factual findings as to the credibility of witnesses."[141]

With respect to the first interview, Sanders has failed to demonstrate that the court's factual findings are clearly erroneous. "A district court's denial of a motion to suppress should be upheld 'if there is any reasonable view of the evidence to support it.'"[142] As previously set forth, the district court found that each time that Sanders requested to talk to an attorney before answering a particular question, Agent Kelly honored his request by changing the subject. This court has previously affirmed the denial of a defendant's motion to suppress in a similar situation. In *United States v.*

---

[137] ROA.228.

[138] Sanders Br. at 59.

[139] *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

[140] *United States v. Garza*, 118 F.3d 278, 283 (5th Cir. 1997).

[141] *Id.*

[142] *United States v. Sarli*, 913 F.3d 491, 495 (5th Cir 2019) (quoting *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)).

*Ivy*,[143] the district court denied a suppression motion, finding that the defendant "was not asking for an attorney but was choosing at that time not to talk about a particular area of inquiry until he talked to an attorney."[144] We noted that after the defendant "expressed his unwillingness to answer questions about where he obtained materials to make a bomb," the police officer "honored this request by moving to a different subject."[145] We held that the district court's interpretation of the defendant's statement was not clearly erroneous.[146]

Similarly, in this case, both Kelly and Werby testified that Sanders's invocations of counsel were qualified. When Kelly asked Sanders why he killed Suellen, Sanders stated that "he wanted to speak to an attorney *before answering that question*."[147] Sanders answered similarly when he was later asked why he killed L.R. and again when asked about his experiences in Nevada before the killings.[148] Each time, Kelly stopped questioning Sanders about these topics and instead began inquiring into a new topic.[149] In light of this evidence, the district court did not clearly err when it concluded that Sanders's invocations of counsel during his first interrogation were limited to certain topics. Accordingly, all the statements Sanders made during his first interview were admissible. Also, because Sanders did not make any

---

[143] 929 F.2d 147 (5th Cir. 1991).

[144] *Id.* at 152.

[145] *Id.* at 153.

[146] *Id.*

[147] ROA.1682 (emphasis added).

[148] ROA.1684-86, 1725.

[149] ROA.1682, 1684-86, 1725-30.

requests for counsel during the second interview at the FBI office, his statements made during that interview were admissible as well.

We now turn to the third interrogation, which was the recorded interview conducted by Agent Walsh and Trooper Moore at a correctional facility.[150] The first forty-eight minutes were spent obtaining information from Sanders regarding where Suellen's body was located.[151] After that, Walsh and Moore began asking Sanders about his relationship with Suellen.[152] The interview transcript demonstrates that Sanders was cooperating and answering those questions.[153] Walsh then asked Sanders if he had worked for a mattress company.[154] In response, Sanders stated, "Um, I want to talk to a lawyer. Stop cussing me, but I want to talk to a lawyer."[155] Walsh then asked: "About what?"[156] Sanders responded: "Before I answer that question or anything to do with other people."[157] Walsh replied that they would stop asking those questions.[158] Walsh then immediately asked Sanders if he would "still continue answering questions."[159] Sanders responded that he would "answer questions as long as you're not talking about other people."[160] Walsh then asked if it was okay to ask questions about Suellen

---

[150] ROA.5614.

[151] ROA.1753, 1760.

[152] ROA.5646.

[153] ROA.5646-47.

[154] ROA.5648.

[155] ROA.5648. The transcript of the interview does not reveal any cursing.

[156] ROA.5648.

[157] ROA.5648.

[158] ROA.5648.

[159] ROA.5648.

[160] ROA.5648.

and L.R.[161]  Sanders agreed, stating: "That's them, you stay in that area, that's fine."[162]   The interview continued with Sanders responding to questions about the trip to Arizona and the murder of Suellen.[163]  Sanders denied having an argument or altercation prior to shooting Suellen.[164]  After Sanders confessed to shooting Suellen, Walsh asked him what happened next.[165]  Sanders replied: "I made [L.R.] get in the car and we left.  Pulled her over up beside her in the car and we got into the car and we left.  I need to talk to a lawyer, that's as far as I'm . . . we just um, we just left and we drove. I didn't know what to do."[166]  Sanders continued: "Um, I shot both of 'em, killed both of them, but the bottom line is what I'll tell you and other than that I need to talk to a lawyer on the other answers and stuff, I need questions answered.  Okay?"[167]  Walsh replied: "Okay . . . that's[] fair . . . I don't want to make you do something that you don't want to do."[168]  Sanders then asked if either state had the death penalty, and Walsh replied that he did not know the answer.[169]  Sanders reiterated that he needed to talk to a lawyer, and Walsh terminated the interview.[170]

---

[161] ROA.5648.

[162] ROA.5648.

[163] ROA.5648-59.

[164] ROA.5659.

[165] ROA.5659.

[166] ROA.5659.

[167] ROA.5659.

[168] ROA.5659.

[169] ROA.5659.

[170] ROA.5660.

No. 15-31114

In the report and recommendation, the magistrate judge found Sanders's first invocation of counsel during the third interview was only with respect to the question whether he had worked for a mattress company.[171] Unlike the first interview, however, Sanders did not limit his invocation to a particular question. In the first interview, Sanders stated that "he wanted to speak to an attorney *before answering that question*."[172] Here, after Sanders stated that he wanted to talk to an attorney, Walsh asked: "About what?"[173] Sanders responded: "Before I answer that question or anything to do with other people."[174] Walsh then asked Sanders if he would "still continue answering questions."[175] Sanders clarified that he would only answer questions regarding Suellen and L.R.[176]

Sanders's invocation of his right to counsel was arguably unambiguous. "[A] reasonable police officer" would have understood Sanders's statement "to be a request for an attorney."[177] Walsh then asked "[a]bout what," and Sanders limited his invocation to certain topics. However, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."[178] After Walsh asked Sanders "[a]bout what," Sanders's response clarified that he was limiting his invocation of the right to counsel.

---

[171] ROA.204-05.

[172] ROA.1682 (emphasis added).

[173] ROA.5648.

[174] ROA.5648.

[175] ROA.5648.

[176] ROA.5648.

[177] *Davis v. United States*, 512 U.S. 452, 459 (1994).

[178] *Smith v. Illinois*, 469 U.S. 91, 100 (1984).

Nonetheless, we cannot know whether Sanders would have limited his invocation without the prompting question from Walsh. Because we are confident that any error was harmless beyond a reasonable doubt, we will assume without deciding for the purpose of this appeal that the district court erred in finding the invocation limited.[179]

Sanders does not expressly argue that the admission of his statements requires reversal of his convictions. Instead, he argues that the government used his statements during the penalty phase to attack his mitigation case, "which emphasized acceptance of responsibility and impaired functioning."[180]

More specifically, Sanders claims that the government used his statements "as 'proof of [his] memory and recollection of [the] day that he killed Suellen'" in order to rebut his claims of cognitive and mental impairments.[181] However, we have concluded that the following statements were admissible: (1) statements from the first interview in the vehicle; (2) statements from the second interview at the FBI office; and (3) statements from the first forty-eight minutes of the third interview at the correctional facility. The only inadmissible statements are those given after the forty-eight-minute mark during the third interview. The statements Sanders made during the first forty-eight minutes demonstrated that he could remember a great deal about the day he murdered Suellen.[182] The same is true for the statements Sanders made during the two prior interviews. From

---

[179] *See United States v. Cannon*, 981 F.2d 785, 789-90 (5th Cir. 1993).

[180] Sanders Br. at 57.

[181] Sanders Br. at 66 (citing ROA.3368).

[182] ROA.5617-48.

this properly admitted evidence, the government was able to argue that Sanders could remember more about his crimes than he otherwise suggested.

Sanders also argues that the government capitalized on his refusal to explain why he committed the crimes to demonstrate he "lacked remorse for his actions."[183]  During the first interview, Sanders refused to answer when he was asked why he killed Suellen and L.R.  Dr. Thompson testified that it was his opinion that Sanders remembered why he killed Suellen and L.R., but Sanders did not want to answer the question.[184]  Based on Dr. Thompson's testimony, the government was able to argue that Sanders was unwilling to discuss why he killed either victim.  A reasonable inference from this testimony is that Sanders was not remorseful.

In sum, the most that can be said of Sanders's inadmissible statements is that they were cumulative of other properly admitted evidence.  Admission of his statements "did not influence the jury, or had but very slight effect" on its analysis.[185]  Sanders is not entitled to a new trial.

## IV

Sanders asserts he was charged with two crimes and was sentenced twice for one act in violation of the Double Jeopardy Clause of the Fifth Amendment, as explicated in *Blockburger v. United States*.[186]  "We review the district court's denial of a motion to dismiss an indictment on double

---

[183] Sanders Br. at 66.

[184] ROA.3314, 3328 ("I do think that he remembers and that he could tell the story of why if he wanted to tell the story.").

[185] *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

[186] 284 U.S. 299 (1932).

jeopardy grounds de novo and accept the underlying factual findings of the district court unless clearly erroneous."[187]

The Fifth Amendment prohibits "an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense."[188] Sanders has been subjected to only one trial, so his right to be free from multiple trials for the same offense is not at issue.[189] His complaint is two-fold. He contends that he cannot be subjected to two punishments for the same crime. He also contends that even if this court invalidates his conviction based on Count Two, we must remand for resentencing because being charged with two counts that were potentially punishable by death "implicated the reliability of the proceeding under the Eighth Amendment and 18 U.S.C. §3593(c)."[190] He essentially argues that "because jurors may get the faulty impression that just because there are two counts, the crime is worse or the defendant more culpable—and therefore more deserving of death."[191] He made similar arguments in another section of his brief regarding a different issue that we do not reach in this appeal.[192]

---

[187] *United States v. Jones*, 733 F.3d 574, 579-80 (5th Cir. 2013) (italics omitted) (quoting *United States v. Gonzalez*, 76 F.3d 1339, 1342 (5th Cir. 1996)).

[188] *Missouri v. Hunter*, 459 U.S. 359, 365 (1983) (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978)).

[189] *See id.* ("Because respondent has been subjected to only one trial, it is not contended that his right to be free from multiple trials for the same offense has been violated.").

[190] Sanders Br. at 54-56.

[191] Sanders Br. at 54.

[192] Sanders Br. at 49 ("More counts may prejudice the jury against the defendant by creating the impression of more criminal activity. . . . There is no other way to be sure that the unlawful conviction did not 'skew[]' the weighing process, putting a 'thumb . . . [on] death's side of the scale.'" (quoting *Stringer v. Black*, 503 U.S. 222, 232 (1992))).

No. 15-31114

The commutation of Sanders's death sentences to life sentences without possibility of parole has mooted his contention that the penalty phase of his trial was tainted and resentencing is required. The only sentencing options before the jury were a death sentence or a life sentence without possibility of parole for each of Counts One and Two.[193] Sanders does not contend that he is or would have been eligible for a sentence other than life without possibility of parole but for a double jeopardy violation. We therefore consider only whether one of his two sentences to life without possibility of parole must be invalidated due to a double jeopardy violation.

The Supreme Court held in *Blockburger* that the government is prohibited from charging a defendant in a single trial with "two distinct statutory provisions" for the "same act or transaction" unless "each provision requires proof of a fact which the other does not."[194] An indictment violating *Blockburger*'s requirements is said to be multiplicitous.[195] However, the Supreme Court has repeatedly explained that "[t]he question of what punishments are constitutionally permissible is no[t] different from the question of what punishment[s] the Legislative Branch intended to be imposed. Where Congress intended . . . to impose multiple punishments, imposition of such sentences does not violate the Constitution."[196] If the cumulative punishment is authorized by the legislature, it does not run afoul of the Double Jeopardy Clause. If the legislature authorizes cumulative punishment, even if the statutes fail the

---

[193] *See, e.g.*, ROA.3410 (penalty phase jury instructions).

[194] *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

[195] *See United States v. Nguyen*, 28 F.3d 477, 482 (5th Cir. 1994).

[196] *Missouri v. Hunter*, 459 U.S. 359, 368 (1983) (emphasis omitted) (quoting *Albernaz v. United States*, 450 U.S. 333, 344 (1981)).

No. 15-31114

*Blockburger* test, "the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial."[197]

Sanders's indictment charged him with one count of interstate kidnapping resulting in death under 18 U.S.C. § 1201(a), and one count under 18 U.S.C. § 924(c)(1)(A) and (j)(1) for murdering a person through the use of a firearm during a crime of violence.[198]  The charge of kidnapping under § 1201(a) served as the predicate crime of violence for the § 924 offense.[199]  The district court observed that the § 924(j) offense required proof of intent to murder and use of a firearm, while the § 1201(a) offense did not.[200]  However, as a predicate offense, the kidnapping charge did not require proof of a fact that § 924 did not.  Accordingly, the offenses fail the elements test under *Blockburger*.

We therefore must determine whether Congress authorized cumulative punishment for violations of § 1201(a) and § 924(c)(1)(A) and (j)(1).  The district court concluded that Congress did authorize cumulative punishment.[201]

In *United States v. Singleton*,[202] this court held that charging a defendant with both a crime of violence and a violation of § 924(c) does not violate the Double Jeopardy Clause.[203]  Our analysis turned on the fact that § 924(c) requires cumulative punishment, and the statute therefore made

---

[197] *Id.* at 369.

[198] ROA.97-100.

[199] ROA.98.

[200] ROA.849-50.

[201] ROA.850-51.

[202] 16 F.3d 1419 (5th Cir. 1994).

[203] *Id.* at 1429.

clear that Congress intended "to punish cumulatively" a § 924(c) violation and the underlying predicate offense.[204]  However, *Singleton* is not on point because § 924(j), unlike § 924(c), does not expressly require cumulative punishment.

Relying on this court's opinion in *United States v. Gonzales*,[205] Sanders asserts that § 924(j)(1) does not authorize cumulative punishment for his two convictions.[206]  He points to this court's statement that "[t]he express language demonstrating the legislature's intent for cumulative punishment is absent in section 924(j)."[207]  Despite this language, we are not convinced that *Gonzales* controls the instant case.  In *Gonzales*, we addressed whether charging a defendant with subsections 924(c) and (j) as *two separate counts* for the same act violated double jeopardy.[208]  We recognized that those two subsections of the statute failed the *Blockburger* test.[209]  We also distinguished Gonzales's offenses from those in *Singleton*.  We explained that Gonzales's convictions were two subsections of one statute, whereas in *Singleton*, there were convictions pursuant to two separate statutes.[210]  We concluded that two convictions under subsections of the same statute made it "less likely that Congress intended sentences for subsections 924(c) and (j) to be imposed for the same conduct, especially absent any express textual evidence

---

[204] *Id.* at 1425.

[205] 841 F.3d 339 (5th Cir. 2016).

[206] Sanders Br. at 53.

[207] Sanders Br. at 53 (quoting *Gonzales*, 841 F.3d at 357).

[208] *Gonzales*, 841 F.3d at 354.

[209] *Id.* at 354-58.

[210] *Id.* at 357.

of such a desire."[211]   Ultimately, we followed the prevailing view of the circuits and held that "there is insufficient indication that Congress intended sentences to be imposed under both subsection 924(j) and the lesser included offense of subsection 924(c) for the same conduct to overcome the *Blockburger* presumption."[212]

The Supreme Court subsequently addressed the interplay between subsections 924(c) and 924(j), holding in *Lora v. United States*[213] that the latter permitted, but did not require, a district court to impose a sentence under § 924(j) to run consecutive to another sentence.[214]   In *Lora*, the defendant was convicted of "aiding and abetting a violation of § 924(j)(1)" and also of "conspiring to distribute drugs, in violation of 21 U.S.C. §§ 841 and 846."[215]   The district court held that it lacked discretion to impose the defendant's § 924(j)(1) sentence to run concurrently with the sentence imposed for the drug conspiracy conviction.  The Supreme Court held the district court erred in this regard, explaining that "[b]ecause the consecutive-sentence mandate in § 924(c)(1)(D)(ii) does not govern § 924(j) sentences, the District Court had discretion to impose Lora's § 924(j) sentence concurrently with another sentence."[216]   The Supreme Court stated specifically "that subsection (j) permits flexibility to choose between concurrent and consecutive sentences."[217]

---

[211] *Id.*

[212] *Id.* at 358.

[213] 599 U.S. 453 (2023).

[214] *See id.* at 455, 464.

[215] *Id*. at 455.

[216] *Id*. at 464.

[217] *Id*. at 463.

No. 15-31114

In *Lora*, the Supreme Court discussed the Double Jeopardy Clause, but in a different context from that raised by Sanders in the present appeal. In *Lora*, the Government argued that "a defendant may be punished for *either* a Section 924(c) offense *or* a Section 924(j) offense, *but not both*."[218]  The Supreme Court "express[ed] no position" on this view.[219]

We note that several decisions from other circuits seem to be in conflict with *Lora* regarding the interplay between § 924(c) and § 924(j).[220] We do not rely on those decisions.  The Supreme Court made clear in *Lora* that "Congress plainly chose a different approach to punishment in subsection (j) than in subsection (c)."[221]  We conclude that the express authorization of cumulative sentences in § 924(c) is not part of § 924(j).

Both § 924(j) and § 1201(a) authorize a sentence of life imprisonment or death.  However, it is not clear from either of these statutes that Congress intended the punishment under either to be cumulative (consecutive).  The Supreme Court explained in *Whalen v. United States* that "where the offenses are the same under [the *Blockburger*] test, cumulative sentences are not

---

[218] *Id*. at 461.

[219] *Id.*

[220] *See United States v. Berrios*, 676 F.3d 118, 138-44 (3d Cir. 2012), *abrogated by Lora v. United States*, 599 U.S. 453 (2023); *United States v. Bran*, 776 F.3d 276, 280-82 (4th Cir. 2015), *abrogated by Lora v. United States*, 599 U.S. 453 (2023); *see also United States v. Dinwiddie*, 618 F.3d 821, 837 (8th Cir. 2010) (applying plain error review); *United States v. Battle*, 289 F.3d 661, 665-69 (10th Cir. 2002) (applying plain error review), *overruled on other grounds by United States v. Melgar-Cabrera*, 892 F.3d 1053, 1060 & n.3 (10th Cir. 2018); *United States v. Allen*, 247 F.3d 741, 769 (8th Cir. 2001) ("Congress fully and clearly intended to permit cumulative punishments for violations of [a predicate offense statute] and § 924(j)."), *vacated on other grounds*, 536 U.S. 953 (2002); *United States v. Ventura*, 742 F. App'x 575, 579 (2d Cir. 2018), *abrogated by Lora v. United States*, 599 U.S. 453 (2023).

[221] *Lora*, 599 U.S. at 462.

31

No. 15-31114

permitted, unless elsewhere specially authorized by Congress."[222]    We therefore conclude that Sanders's two sentences do violate the Double Jeopardy Clause.  Accordingly, we vacate Sanders's sentence based on his conviction under § 924(j).

## V

Sanders contends that African-Americans and young adults were excluded from the grand and petit jury venires in violation of due process, equal protection, the Sixth Amendment's "fair cross-section" requirement, and the Jury Service and Selection Act.[223]  Relatedly, we consider whether the district court abused its discretion when it denied Sanders's request for discovery regarding the composition of the jury venires.  We review the district court's factual findings for clear error and its legal conclusions de novo.[224]

With respect to Sanders's due process and equal protection challenges to the venires, Sanders concedes that there was no "proof of intentional discrimination" and that Supreme Court precedent precludes relief under this theory.[225]  He raises these two arguments to preserve them for review by the Supreme Court.

---

[222] 445 U.S. 684, 693 (1980).

[223] Sanders Br. at 68; 28 U.S.C. §§ 1861-63.

[224] *See United States v. McKinney*, 53 F.3d 664, 670 (5th Cir. 1995) (reviewing a factual determination for clear error); *United States v. Hemmingson*, 157 F.3d 347, 358 (5th Cir. 1998) ("[T]o the extent the decision rests on the court's interpretation of the Act's language, the standard of review is de novo." (italics omitted)).

[225] Sanders Br. at 82 (first citing *Swain v. Alabama*, 380 U.S. 202, 203-05 (1965), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986); and then citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)).

No. 15-31114

We next turn to his argument that the jury venires were not selected from a fair cross-section of the community in violation of the Sixth Amendment. To make a prima facie showing of this claim, a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[226]

Sanders contends that young adults were improperly excluded from his venires.[227] Sanders's grand jury was empaneled in 2010 and drawn from a master jury wheel that was filled in 2007.[228] In 2014, Sanders's petit jury was drawn from a master jury wheel that was filled in 2011.[229] Because the master wheels were three years old, people roughly between the ages of eighteen and twenty-one were unable to serve on either of Sanders's juries. In *United States v. Gooding*,[230] we held that a jury plan's exclusion of young citizens between eighteen and twenty-one years old does not violate the fair cross-section requirement.[231] We rejected the claim that "those who have become eligible for jury service by attaining voting age within the last three years and four months" constitute a distinct group such that "their

---

[226] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

[227] Sanders Br. at 68.

[228] ROA.833.

[229] ROA.1280, 1290.

[230] 473 F.2d 425 (5th Cir. 1973).

[231] *Id.* at 429-30.

temporary exclusion from jury service violates their statutory right to serve on juries or [the] defendant's right to a fair trial."[232]  Sanders has failed to establish the first prong of the prima facie case—that this group is distinctive within the community.  Although Sanders invites us to reconsider our holding in *Gooding*, we are not free to do so in the absence of an intervening change of precedent.[233]

With respect to Sanders's challenge to the grand and petit venires based on the alleged exclusion of African-Americans, our precedent makes clear that they qualify as a distinctive group within the community under the first prong of the prima facie case.[234]  However, the parties dispute whether African-Americans were sufficiently underrepresented, the second prong of the prima facie case.

We first consider the grand jury venire.  To determine whether a defendant has shown that the representation of a group is not fair and reasonable, we measure the absolute disparity between the proportion of jury-eligible African-Americans in the community and their representation on the venire.[235]  The district court used the 2013 Clerk of Court's AO12 Statistics Report, which provided that African-Americans constituted 32% of the community and 23.35% of the qualified jury wheel.[236]  The district court

---

[232] *Id.* at 430.

[233] *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014).

[234] *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001).

[235] *See Berghuis v. Smith*, 559 U.S. 314, 323 (2010) (explaining how to calculate absolute disparity); *United States v. Maskeny*, 609 F.2d 183, 190-91 (5th Cir. 1980) (relying on absolute disparity in resolving challenges to representation of distinctive groups on jury venires).

[236] ROA.567-68 (dated 8/28/2013).

found that there was an absolute disparity of 8.65%.[237]  Contrary to Sanders's argument,[238] the district court did not find that the *estimates* from the census should be used in place of the actual census data.[239]  Instead, the district court held that even if Sanders's own estimates showing a disparity of 10.81% were used, it would not find that 10.81% disparity sufficient to satisfy the second prong.[240]  We agree with the district court that a 10.81% disparity offers Sanders no relief.  This court has found that absolute disparities of 10% and 11% failed to satisfy the second prong of the prima facie case.[241]  Because Sanders failed to satisfy the second prong, we need not consider the third prong of the prima facie case—whether the existing disparity was the result of systematic exclusion.

We now turn to the claim that African-Americans were underrepresented on the petit jury venire.  To determine whether Sanders had made a showing with respect to the second prong of the prima facie case, the district court used the 2012 Clerk of Court's AO12 Statistics Report, which provided that African-Americans constituted 29.4% of the community and 18.12% of the qualified jury wheel.[242]  The absolute disparity was therefore 11.28%.  We have "recognized that absolute disparities of 19.7%,

---

[237] ROA.836-37.

[238] Sanders Br. at 70.

[239] ROA.837.

[240] ROA.837-38.

[241] *Mosley v. Dretke*, 370 F.3d 467, 479 (5th Cir. 2004) ("This Court has also recognized that absolute disparities of 10% or less are insufficient to establish statistical discrepancies worthy of relief." (citing *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980))); *Thompson v. Sheppard*, 490 F.2d 830, 832-34 (5th Cir. 1974) (affirming a district court judgment that had resulted in the compilation of a new jury list with an 11% disparity).

[242] ROA.1019-20 (dated 2/24/2012).

14.7% and 13.5% are sufficient to satisfy this prong."[243]    However, as stated above, this court has found that absolute disparities of 10% and 11% failed to satisfy the second requirement of the prima facie case.   Here, the 11.28% disparity is only marginally different from the 11% disparity this court found insufficient to meet the second prong.[244]    We are not persuaded that a disparity of 11.28% is sufficient to satisfy the second prong when 11% is not. Because Sanders fails to satisfy the second prong, we need not consider the third prong.   Accordingly, Sanders has failed to show a violation of the Sixth Amendment's fair cross-section requirement.

Sanders further argues that he is entitled to relief under the Jury Service and Selection Act.[245]   The Act ensures "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."[246]   To obtain relief, Sanders "must prove a 'substantial failure' to comply with the Act's provisions."[247] Specifically, he must demonstrate noncompliance with the Act "that destroys the random nature or objectivity of the selection process."[248] Sanders fails to make such a showing.

Sanders's arguments mirror the arguments he raised to demonstrate a violation of the Sixth Amendment's fair cross-section requirement.   He faults the jury-selection procedures insofar as using "voter registration lists

---

[243] *Mosley*, 370 F.3d at 479.

[244] *Thompson*, 490 F.2d at 832-34.

[245] Sanders Br. at 77.

[246] 28 U.S.C. § 1861.

[247] *United States v. Olaniyi-Oke*, 199 F.3d 767, 772 (5th Cir. 1999) (quoting *United States v. Hemmingson*, 157 F.3d 347, 358 (5th Cir. 1998)).

[248] *Id.*

produced a statistically significant [underrepresentation] of African-American jurors," and "[r]econstituting the juror list only every four years" negatively impacted the number of African-Americans and young citizens eligible to serve as jurors.[249]  However, the Act expressly allows the selection of jurors based on voter registration rolls and authorizes refilling the master jury wheel every four years.[250]  Sanders's arguments that these specific, statutorily authorized features of the district court's jury-selection plan violated the Act are therefore unconvincing.  This claim fails to merit relief.

Finally, Sanders contends that the district court erred in denying his motion for discovery.[251]  We review rulings on discovery for abuse of discretion.[252]  Sanders requested documents in the government's possession concerning the composition of each venire.  He argues that the government had discoverable information in light of its then-ongoing civil suit against the State of Louisiana for violations of the National Voter Registration Act.[253]  We decline to hold that the district court abused its discretion because any information in the government's possession would only have been relevant insofar as it could have shed light on whether any racial disparity was "due to systematic exclusion of [African-Americans from] the jury-selection process," which is the third prong of the prima facie case.[254]  As discussed, because Sanders failed to satisfy the first prong with respect to young people and the second prong with respect to African-Americans, we do not need to

---

[249] Sanders Br. at 70.

[250] 28 U.S.C. § 1863(b)(2), (4).

[251] Sanders Br. at 72.

[252] *United States v. Conn*, 657 F.3d 280, 284 (5th Cir. 2011) (per curiam), *abrogated on other grounds by Davis v. United States*, 589 U.S. 345 (2020) (per curiam).

[253] Sanders Br. at 74.

[254] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

No. 15-31114

reach the third prong.  With no need for this discovery, Sanders has failed to show that the district court abused its discretion in denying his request.

## VI

Sanders asserts that the district court erred in death-qualifying the jury.  Death-qualifying is removing for cause "prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial."[255]  Sanders argues that: (1) death-qualifying a jury is not authorized by federal law or common law; (2) death-qualification violates the Sixth Amendment's fair cross-section requirement; and (3) death-qualification violates the First Amendment.[256]

As to his first argument, Sanders contends that the regulation of challenges for cause is left to the common law or to federal statutes.[257]  He argues that the Supreme Court allowed death-qualification in state court cases only after state legislatures had authorized the practice.[258]  He contends that because neither the common law nor Congress has authorized the practice, the district court erred in death-qualifying the jury over his objection.[259]  However, as the government notes, 28 U.S.C. § 1866(c)(2) permits courts to excuse jurors who "may be unable to render impartial jury service."  In *Wainwright v. Witt*,[260] the Supreme Court explained that an impartial jury consists of "jurors who will conscientiously apply the law and

---

[255] *Lockhart v. McCree*, 476 U.S. 162, 165 (1986).

[256] Sanders Br. at 83.

[257] Sanders Br. at 85.

[258] Sanders Br. at 84-85.

[259] *See* Sanders Br. at 85-86.

[260] 469 U.S. 412 (1985).

find the facts."[261]  The Court rejected the proposition that a defendant who is being tried for a capital crime "is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor."[262]  The Court made clear that the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[263]  The reasoning espoused in *Witt*, when coupled with the enabling language in § 1866(c), allows district courts to death-qualify juries in federal cases.  The district court did not err in determining whether the prospective jurors' views on capital punishment would prevent or substantially impair the performance of their duties in accordance with their instructions and oath.

With respect to the second argument, Sanders recognizes that in *Lockhart v. McCree*,[264] the Supreme Court rejected the argument that death-qualification of a jury violated the Sixth Amendment's fair cross-section requirement.[265]  Nevertheless, he contends that there is now empirical evidence that demonstrates that excluding prospective jurors who do not believe in the death penalty is excluding members of protected classes such as women and racial minorities.[266]  Sanders states that this evidence was unavailable over thirty years ago at the time of the Supreme Court's decision.

---

[261] *Id.* at 423.

[262] *Id.*

[263] *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

[264] 476 U.S. 162 (1986).

[265] Sanders Br. at 87 (citing *Lockhart*, 476 U.S. at 165).

[266] Sanders Br. at 87.

No. 15-31114

We note that more recently, in 2011, relying on *Lockhart*, we rejected this argument.[267] We may not overrule the decision of a prior panel in the absence of en banc consideration or a superseding Supreme Court decision.[268] We are bound by both Supreme Court and Fifth Circuit precedent and must deny relief on this claim.

Finally, Sanders argues that death-qualifying the jury "infringes on freedom of religion."[269] Sanders contends that the district court erred in including questions about prospective jurors' religious beliefs on its jury questionnaire and during voir dire. District courts are afforded "great latitude in deciding what questions should be asked on voir dire."[270] Here, the questionnaire asked whether the prospective jurors' religion had a "position on the propriety of . . . the death penalty."[271] In *United States v. Whitfield*,[272] this court held that a district court does not abuse its discretion when it excuses a prospective juror because "her religious beliefs prevented her from passing judgment on others."[273] Although *Whitfield* was not a capital case, the Supreme Court has made clear that empaneling an impartial jury is grounded in the Sixth Amendment and not the Eighth Amendment.[274] If a prospective juror's religious beliefs would prevent the person from

---

[267] *United States v. Simpson*, 645 F.3d 300, 312 (5th Cir. 2011) ("Death penalty opponents are not a 'distinctive group,' and 'death qualification does not violate the fair-cross-section requirement.'" (quoting *Lockhart*, 476 U.S. at 177)).

[268] *United States v. Lipscomb*, 299 F.3d 303, 313 n.34 (5th Cir. 2002).

[269] Sanders Br. at 89.

[270] *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) (italics omitted).

[271] ROA.5665.

[272] 590 F.3d 325 (5th Cir. 2009).

[273] *Id.* at 360.

[274] *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).

impartially applying the law, the district court has discretion to excuse that person.[275]  Sanders has failed to show that the district court abused its discretion in inquiring how a prospective juror's religious beliefs would impact the juror's ability to follow the law in this capital case.

## VII

Sanders contends that the district court erred in granting the government's motion to strike a venire member for cause based solely on her answers to the juror questionnaire without any voir dire.[276]  The district court struck her based on her views regarding the death penalty.[277]  As previously discussed, a "court may strike jurors for cause if their views on capital punishment would 'prevent or substantially impair' the performance of their duties 'in accordance with the instruction[s] and oath.'"[278]  Sanders objected to the court's granting the motion to strike the venire member.[279]

This court reviews "such claims for abuse of discretion, affording 'considerable deference' to the trial court."[280]  Relying on a Tenth Circuit opinion, Sanders asserts that this claim should be reviewed de novo because the exclusion of the venire member was based on written answers to a juror

---

[275] *Id.*

[276] Sanders Br. at 92.

[277] ROA.3476.

[278] *United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007) (quoting *United States v. Webster*, 162 F.3d 308, 340 (5th Cir. 1998)).

[279] ROA.3476.  This was the only venire member the court struck prior to voir dire based on the government's objection.  The district court also granted the defense's for-cause challenges to three venire members based solely on their questionnaire responses. ROA.6196.

[280] *Fields*, 483 F.3d at 357 (quoting *United States v. Bernard*, 299 F.3d 467, 474 (5th Cir. 2002)).

questionnaire without any voir dire.[281] As Sanders recognizes, other circuits have held that the abuse-of-discretion standard applies even when the exclusion is made without any voir dire.[282] We need not determine which standard of review applies because we are not persuaded that the district court erred under either one.

Sanders asserts that the venire member's answers did not demonstrate that the venire member would automatically choose a life sentence.[283] However, we have stated that a "district court is not limited to disqualifying only those jurors who would never vote for the death penalty but can excuse those who cannot set aside their own predilections in deference to the rule of law."[284]

On the morning of the first day of jury selection, the district court explained that it had sustained the government's challenge to the instant venire member because the "person's answers appeared to be rather off the wall."[285] The court further stated that the "particular emphasis on religion that she had in her answers and her general views with regard to the death penalty and, finally, her statement here that her son was killed and she felt it was a cover-up" were "bizarre."[286]

---

[281] Sanders Br. at 93 (citing *United States v. Chanthadara*, 230 F.3d 1237, 1269-70 (10th Cir. 2000)).

[282] *United States v. Quinones*, 511 F.3d 289, 302-04 (2d Cir. 2007); *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).

[283] Sanders Br. at 93.

[284] *United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995) (citation omitted).

[285] ROA.3476.

[286] ROA.3476.

No. 15-31114

On the questionnaire, the venire member's answers provided that it was God's "job" to judge—not man's.[287]  Referring to the Bible, she wrote that it says thou shalt not kill.[288]  Her view was that executing a person because he had killed someone was just as wrong as the initial murder.[289]  Her answers also indicated that she was skeptical of the criminal justice system and thought it had unjustly treated her brother.[290]  She stated that her son had been killed, and she believed there was a cover-up.[291]  When the questionnaire asked if she could be a fair and impartial juror after hearing graphic testimony and viewing photographs of injuries from a violent crime, she checked "maybe" and wrote that it depended on the evidence and if the defendant had been "set up."[292]  When asked whether she could follow the court's instructions not to allow sympathy, bias, or prejudice to enter into the jury's deliberations with respect to whether the defendant was guilty, she wrote, "I don't know."[293]

We are persuaded that the venire member's answers demonstrated that she would have had difficulty or would have been unable to follow the court's instructions.  The venire member's answers to the questionnaire demonstrated that she had views on the death penalty that would have prevented or substantially impaired the performance of her duties in

---

[287] ROA.5665.

[288] ROA.5665.

[289] ROA.5665.

[290] ROA.5670.

[291] ROA.5668.

[292] ROA.5675.

[293] ROA.5675.

accordance with the court's instructions and her oath. Sanders has not shown that the district court erred in striking this venire member for cause.

## VIII

Sanders argues that the evidence was insufficient to support the kidnapping verdict because the government presented no evidence of any purpose for the abduction of L.R.[294] Sanders preserved this argument before the district court.[295] We review challenges to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the prosecution.[296]

Sanders was convicted of kidnapping in violation of 18 U.S.C. § 1201(a), which provides in relevant part that:

> Whoever unlawfully . . . kidnaps . . . and holds for ransom or reward or otherwise any person . . . when the person is willfully transported in interstate or foreign commerce . . . shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

Sanders argues that the government failed to prove the element of held for "ransom, reward or otherwise" under the kidnapping statute.[297] More specifically, he contends that the government failed to submit any evidence of the purpose of, or the benefit derived from, the kidnapping.[298] This court has explained that the holding of the victim is the gravamen of the element

---

[294] Sanders Br. at 102.

[295] ROA.2327-30.

[296] *United States v. Njoku*, 737 F.3d 55, 62 (5th Cir. 2013).

[297] Sanders Br. at 102.

[298] Sanders Br. at 103.

and "not the benefit."[299]   We explained that the Supreme Court has "interpreted the 'or otherwise' . . . to encompass any benefit a captor might attempt to receive" and that the purpose did not have to be illegal.[300] "Although the government must plead and prove that the defendant held the victim for some purpose, the exact nature of that purpose is inconsequential. Indeed, . . . any purpose will do."[301]   Further, the jury is not required to unanimously agree on the purpose for the kidnapping.[302]

Sanders argues that the only relevant evidence in the record stems from the police's questioning him regarding his motive for kidnapping, and he responded that he did not know what to do.[303]   He argues there is no evidence regarding the purpose of the kidnapping.  We are not persuaded by this argument.  The jury was free to infer from the evidence that Sanders kidnapped L.R. because she was the only witness to her mother's murder. The government contends that Sanders's driving away in the aftermath of the murder gained him distance and time to determine what he would do with L.R.[304]   The fact that he murdered L.R. at the end of the road trip confirms that Sanders had a purpose for the kidnapping.  Sanders's argument would require that a defendant confess his motive in order for a jury to convict him of kidnapping the victim.  We are satisfied that the evidence showed Sanders kidnapped L.R. for a purpose.  His argument is wholly without merit.

---

[299] *United States v. Webster*, 162 F.3d 308, 328 (5th Cir. 1998).

[300] *Id.* (citing *Gooch v. United States*, 297 U.S. 124, 128 (1936)).

[301] *Id.* at 329.

[302] *Id.* at 329-30.

[303] Sanders Br. at 104.

[304] Government Br. at 81.

No. 15-31114

Sanders also contends that the evidence is insufficient to support the three statutory aggravating factors found by the jury[305]—those being, (1) the death of L.R. occurred during the commission of a kidnapping; (2) the offense involved substantial planning and premeditation; and (3) L.R. was particularly vulnerable due to her youth.[306] "[A] defendant is not death eligible unless the sentencing jury also finds that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors set forth at [18 U.S.C.] § 3592."[307] Because it is unclear whether the commutation of Sanders's death sentences to life sentences without parole mooted Sanders's contentions, we consider them.

The government asserts that Sanders did not object in the district court to the insufficiency of the evidence to support any of the three statutory aggravating factors, and thus, these claims should be reviewed for plain error.[308] Because Sanders does not dispute the government's assertion in his reply brief, and because we have found no such objection in the record, we review these claims for plain error.

This court reviews "jury findings of aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt."[309] For the jury to find the first factor, the government was required to prove that the death of L.R.

---

[305] Sanders Br. at 106.

[306] ROA.1613-14.

[307] *Jones v. United States*, 527 U.S. 373, 376-77 (1999) (citing 18 U.S.C. § 3593(e)).

[308] Government Br. at 103.

[309] *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002).

occurred during the commission of a kidnapping.[310]  As set forth above, the evidence was sufficient to show that the death of L.R. occurred during a kidnapping in violation of 18 U.S.C. § 1201(a).  Sanders has failed to show plain error.

For the second factor, the government was required to prove the offense involved substantial planning and premeditation.[311]

> [A] killing is 'premeditated' when it is the result of planning or deliberation.  The amount of time needed for premeditation of a killing depends on the person and the circumstances.  It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.[312]

The evidence at trial established that, just prior to leaving on the Labor Day weekend trip with Suellen and L.R., Sanders purchased ammunition for his rifle.  He packed his rifle, the newly purchased ammunition, and a knife for the trip.  After killing Suellen, Sanders confessed that he "made [L.R.] get in the car and we left."[313]  The evidence showed that Sanders drove L.R. in Suellen's car for three or four days across several states until he decided what to do with her.  He took her to a remote area that was not far from his childhood home.[314]  There, he used the rifle and the knife he had packed to kill L.R.  He shot L.R. in the head three times and once in the chest.  The evidence showed that the rifle required reloading after each shot.  After shooting her four times, he violently slit her throat with the knife he had

---

[310] 18 U.S.C. § 3592(c)(1).

[311] *Id.* § 3592(c)(9).

[312] *See United States v. Snarr*, 704 F.3d 368, 392 (5th Cir. 2013) (quoting *United States v. Agofsky*, 516 F.3d 280, 282 n.2 (5th Cir. 2008)).

[313] ROA.5777.

[314] ROA.2144, 2780-81.

packed.  Sanders asserts that although the evidence may be sufficient to show substantial planning for the murder of Suellen, the evidence is insufficient to show substantial planning for the kidnapping and murder of L.R.[315]  We disagree.  Based on the evidence before it, the jury could rationally infer planning and premeditation with respect to the kidnapping and murder of L.R.  Viewing this evidence in the light most favorable to the government, we are convinced that any rational trier of fact could have found that the kidnapping and murder of L.R. involved substantial planning and premeditation.  Sanders has certainly not shown plain error.

For the third factor, the government was required to prove that the victim was particularly vulnerable due to her youth.[316]  It is undisputed that L.R. was a twelve-year-old child.  Sanders contends that although L.R. was young, she "would not have been relatively disadvantaged confronting [him], compared to adults in the same situation."[317]  Sanders points out that L.R.'s mother, an adult woman, was unable to escape being murdered by him.[318]  Here, the jury could find that the victim was particularly vulnerable due to her age and the evidence at sentencing that showed her innocent and childish mindset.  For example, L.R.'s sixth grade teacher testified that L.R. "was just very naïve" and that she "wasn't as worldly wise as some sixth grade girls can be."[319]  Moreover, on cross-examination, Marianne von Dach responded affirmatively when asked if she "would be much more able to defend" herself

---

[315] Sanders Br. at 107-08.

[316] 18 U.S.C. § 3592(c)(11).

[317] Sanders Reply Br. at 35-36.

[318] Sanders Br. at 109.

[319] ROA.2467.

as an adult as compared to a twelve-year-old child.[320]   This testimony supports the jury's finding of vulnerability due to L.R.'s youth.  Sanders has not shown plain error.

## IX

Sanders argues that the government presented victim impact testimony during the penalty phase that was so prejudicial it rendered his sentences unconstitutional.[321]   Here again, it is unclear whether the commutation of Sanders's death sentences to life without possibility of parole renders this issue moot.  Accordingly, we address his arguments.  Because Sanders failed to object to the testimony, we review the claim for plain error.

In *Payne v. Tennessee*,[322] the Supreme Court explained that victim impact evidence "is designed to show [a] victim's 'uniqueness as an individual human being.'"[323]  The prosecution

> has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.[324]

---

[320] ROA.3196 ("Yes, probably.").

[321] Sanders Br. at 109-10.

[322] 501 U.S. 808 (1991).

[323] *Id.* at 823.

[324] *Id.* at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (WHITE, J., dissenting)).

No. 15-31114

Victim impact evidence is admissible during sentencing unless it "is so unduly prejudicial that it renders the trial fundamentally unfair [in violation of] the Due Process Clause of the Fourteenth Amendment."[325]

Sanders contends that the victim impact testimony from two of L.R.'s sixth grade teachers was inadmissible "because they were not family members and did not testify to the effect of L.R.'s death on her family."[326] In support of his contention, Sanders cites *United States v. Fields*.[327] In that case, the Tenth Circuit opined that victim impact testimony from friends was admissible.[328] It further stated, however, that "[w]ithout additional guidance from the [Supreme] Court," it would not hold that testimony with respect to the murder's impact on co-workers was admissible.[329] The Tenth Circuit's opinion indicates that the Supreme Court has not expressly addressed which witnesses outside the victim's family are permitted to provide victim impact testimony. However, as quoted above, the Supreme Court has recognized that the victim's "death represents a *unique loss to society* and in particular to his family."[330] This language indicates that witnesses outside the family might be permitted to testify. At the very least, allowing such witnesses to testify would not constitute plain and obvious error.

---

[325] *Id.*

[326] Sanders Br. at 119.

[327] 516 F.3d 923 (10th Cir. 2008).

[328] *Id.* at 946-47.

[329] *Id.* at 947.

[330] *Payne*, 501 U.S. at 825 (emphasis added).

Fifth Circuit precedent does not provide clear guidance as to whether the teachers' testimony is admissible.[331]  Other circuits have rejected the argument that admission of victim impact testimony is only allowed to be introduced through the victim's family.[332]  While we recognize that the Federal Death Penalty Act (FDPA)[333] refers to the "loss suffered by the victim and the victim's family,"[334] the Ninth Circuit has found that language to be illustrative and not exhaustive.[335]  Under these circumstances, Sanders has not shown that allowing non-family members to give victim impact testimony constituted plain and obvious error.[336]

Sanders also argues that the district court erred in allowing L.R.'s great aunt, Patricia Cloutier, to read from L.R.'s journals during her testimony.[337]  Cloutier testified that L.R. would travel from Las Vegas to visit her in New Hampshire every summer.[338]  Cloutier gave L.R. two journals during her last visit in the summer of 2010.[339]  One of the journals was an

---

[331] *See United States v. Bernard*, 299 F.3d 467, 477-78 (5th Cir. 2002) (addressing whether third-party testimony "contained improper references to religion and improper characterizations of the perpetrators and their crimes" but not specifically considering whether, as a threshold matter, third-party victim impact testimony is admissible).

[332] *See United States v. Mikhel*, 889 F.3d 1003, 1052-53 (9th Cir. 2018); *United States v. Lawrence*, 735 F.3d 385, 405-06 (6th Cir. 2013); *United States v. Whitten*, 610 F.3d 168, 188 (2d Cir. 2010); *United States v. Bolden*, 545 F.3d 609, 626 (8th Cir. 2008).

[333] 18 U.S.C. §§ 3591-98.

[334] *Id.* § 3593(a).

[335] *Mikhel*, 889 F.3d at 1053.

[336] *United States v. Broussard*, 669 F.3d 537, 550 (5th Cir. 2012) (explaining that if there is no binding precedent, any error was not plain).

[337] Sanders Br. at 109.

[338] ROA.2472.

[339] ROA.2478.

"American Girl journal," in which L.R. answered questions about her feelings.[340]  The journal also had lists for L.R. to write about her favorite things such as her favorite stuffed animal, color, and holiday.[341]  L.R. also answered questions in the journal about how she would react to various scenarios.[342]  The other journal Cloutier gave L.R. was one in which L.R. documented her trip to New Hampshire during the summer of 2010.[343]

Sanders asserts that "Cloutier's otherwise appropriate testimony crossed into plain error" during her testimony about L.R.'s journals.[344]  We disagree.  Victim impact evidence "is designed to show [a] victim's 'uniqueness as an individual human being.'"[345]  Further, the government was entitled to counteract the mitigating evidence that Sanders placed before the jury.[346]  To put the challenged testimony into perspective, Cloutier's testimony with respect to the journals covered approximately thirty pages of transcript, and Sanders's evidence in mitigation covered approximately 650 pages.  Although Cloutier's testimony with respect to L.R.'s journals was poignant and emotional, we are far from convinced that it was so unduly prejudicial that it rendered Sanders's sentencing hearing fundamentally unfair.[347]  Sanders has failed to show that Cloutier's testimony constituted plain error.

---

[340] ROA.2478-79.

[341] ROA.2482-83.

[342] ROA.2485.

[343] ROA.2504.

[344] Sanders Br. at 114.

[345] *Payne v. Tennessee*, 501 U.S. 808, 823 (1991).

[346] *Id.* at 825.

[347] *Id.*

No. 15-31114

## X

Sanders argues that the prosecutor's closing argument during the penalty phase constituted misconduct that requires a new sentencing hearing. Here again, it is unclear whether the commutation of the death sentences mooted this issue. The prosecutor's argument may arguably have affected the jury's answer to "gateway issues," which may have had some impact on whether he might have been eligible for a sentence other than imprisonment for life without the possibility of parole. We address the arguments regarding closing argument out of an abundance of caution.

Our court follows a two-step approach when evaluating claims of prosecutorial misconduct.[348] First, we "decide whether the prosecutor made an improper remark" based on "the context in which [the remark was] made."[349] Second, if the prosecutor made an improper remark, we decide "whether the remark 'prejudiced the defendant's substantive rights.'"[350] To make that determination, we consider "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence" against the defendant.[351] "The determinative question is whether the prosecutor's remark casts serious doubt on the correctness of the jury's verdict."[352]

Sanders challenges several portions of the prosecutor's closing argument at the penalty phase. Because Sanders did not object to any of the

---

[348] *United States v. Morganfield*, 501 F.3d 453, 467 (5th Cir. 2007) (citing *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004)).

[349] *Id.*

[350] *Id.* (quoting *Insaulgarat*, 378 F.3d at 461).

[351] *Id.* (quoting *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995)).

[352] *Id.* (quoting *Insaulgarat*, 378 F.3d at 461).

arguments, these challenges are reviewed for plain error.[353]  Sanders first points to the following remarks made by the prosecutor during closing argument: L.R. "didn't deserve to spend three or four days in the car with her mother's murderer not knowing what was coming next. *We don't know what other horrors she endured. We don't know.*"[354]  Sanders contends that the prosecutor's remarks improperly insinuated that Sanders sexually abused L.R. during the trip from Arizona to Louisiana after he killed her mother.[355]  We do not agree that the complained of remarks necessarily implied that Sanders sexually abused L.R.  The undisputed evidence established that immediately after shooting L.R.'s mother in the head, Sanders kidnapped L.R. and drove across several states for a period of three to four days.  It would be horrific for a twelve-year-old girl to be trapped in a car for several days and nights with the man who had murdered her mother in her presence.  Based on the evidence, the prosecutor could reasonably infer that this was a horrifying trip for L.R. to endure.[356]

Even if the remarks were construed to encourage the jury to speculate, Sanders has failed to show that the remarks prejudiced his substantial rights.  Dr. Thompson, the government's psychiatrist, testified that he asked Sanders what occurred during the car trip, and Sanders responded that he did not feel comfortable talking about it or "why" he did it.[357]  Dr. Thompson did not think that it was because Sanders could not remember what had

---

[353] *United States v. Perez-Solis*, 709 F.3d 453, 466-67 (5th Cir. 2013).

[354] ROA.3402 (emphasis added).

[355] Sanders Br. at 123.

[356] *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009) ("A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence.").

[357] ROA.3313.

happened or why he did it.[358]  Dr. Thompson testified that Sanders is in a "pretty tough situation and there may be some things he wants to keep to himself and not tell everybody."[359]  Sanders did not object to this testimony. This testimony apparently refers to Sanders's conduct during the car trip with L.R.  Accordingly, prior to closing argument, the jury already had testimony before it that invited speculation with respect to what occurred during the car trip.  The prosecutor's remarks were of the same ilk.  The court also instructed the jury that the attorneys' arguments do not constitute evidence.[360]  The challenged argument consists of two short sentences in a record of several thousand pages.[361]  Given the evidence of the murder of L.R.'s mother, the duration of the kidnapping, and the manner of L.R.'s brutal, deliberate murder, Sanders has not shown that his substantial rights were violated.  He has not shown plain error.

Based on this same alleged prosecutorial misconduct, Sanders contends that the district court erred in denying his motion to set aside the sentencing verdict.[362]  For the same reasons we find no plain error, we also hold that Sanders has not shown that the district court abused its discretion in denying the motion for new trial.[363]

---

[358] ROA.3314.

[359] ROA.3314.

[360] ROA.3411.

[361] *United States v. Rice*, 607 F.3d 133, 140 (5th Cir. 2010) (finding erroneous statements to be minimal and harmless in part because the "statements occupy only a few lines in a record that spans several thousand pages").

[362] Sanders Br. at 126.

[363] *See United States v. Piazza*, 647 F.3d 559, 564-65 (5th Cir. 2011) (reviewing decision to grant or deny motion for a new trial for abuse of discretion).

Sanders next contends that the prosecutor's mischaracterization of the mitigation evidence constituted misconduct.    Sanders presented evidence that he suffered from brain damage and mental illness. Dr. Stewart, the defense's psychiatrist,[364] testified that "Sanders suffers from a very serious chronic psychotic illness called 'schizoaffective disorder,' with a qualifier being bipolar type."[365]  Dr. Stewart testified that Sanders had multiple head injuries that resulted in brain damage[366] and impaired executive functioning.[367]  Dr. Ruben Gur, the defense's neuropsychologist with expertise in neuroimaging,[368] testified that the imaging showed that Sanders had brain damage.[369]  Dr. Gur testified that several structures in Sanders's brain were "abnormally small"[370] and that Sanders's "speed of processing is extremely slow."[371]  The government called Dr. Bianchini, a neuropsychologist,[372] as a witness.  Dr. Bianchini testified that although Sanders "does have some brain dysfunction," he performed "normally" on tests for executive functions.[373]  The government also called Dr. John Thompson, a forensic psychiatrist, who testified that although Dr. Stewart found that Sanders had executive functioning deficits, he "didn't see that in

---

[364] ROA.2791.

[365] ROA.2976.

[366] ROA.3045.

[367] ROA.3012, 3045.

[368] ROA.3111.

[369] ROA.3165-67.

[370] ROA.3148.

[371] ROA.3158.

[372] ROA.3228.

[373] ROA.3238.

the testing."[374]  Dr. Thompson further testified that when he interviewed Sanders he did not observe signs of schizoaffective disorder, bipolar type.[375]

Sanders challenges the prosecutor's argument that Sanders "doesn't have executive functioning problems."[376]  This was permissible argument by the prosecutor because Dr. Bianchini testified that Sanders "performs normally" on tests with respect to executive function.[377]  During closing argument, a prosecutor may discuss the evidence admitted at trial and reasonable inferences that can be drawn from the evidence.[378]

Sanders also points to the prosecutor's remarks that Dr. Stewart's findings were not supported by any of the other experts.  The record shows that the government's expert witnesses disagreed with Dr. Stewart's diagnoses of schizoaffective disorder with bipolar and impaired executive functioning.  To the extent the prosecutor was referring to the schizoaffective disorder diagnosis, we have found no other expert testimony agreeing with Dr. Stewart's diagnosis.  Indeed, as previously set forth, Dr. Thompson, the government's psychiatrist, saw no signs of schizoaffective disorder when he interviewed Sanders and when he reviewed Sanders's test results. Accordingly, the prosecutor's remark that no other expert agreed with Dr. Stewart's diagnosis of schizoaffective disorder is proper argument.

With respect to the finding of impaired executive functioning, the defense expert witness, Dr. Gur, testified that Sanders "performs very well

---

[374] ROA.3318.

[375] ROA.3320.

[376] ROA.3371.

[377] ROA.3238.

[378] *United States v. Bowen*, 818 F.3d 179, 191 (5th Cir. 2016) (per curiam).

on a task of abstraction and mental flexibility, which is a frontal lobe task."[379] Dr. Gur had already testified that the frontal lobe involves the executive function.[380] Dr. Gur further testified that Sanders's accuracy on the frontal lobe tests is normal "but his speed of processing is extremely slow."[381] Dr. Gur stated that Sanders's executive functional attention and working memory is from "a bit over one, up to two and a half standard deviation below average."[382]    Although Dr. Gur's testimony is not crystal clear, we understand it to provide some support for Dr. Stewart's finding of executive impairment. It was arguably improper to state that all the experts disagreed with Dr. Stewart's finding of impaired executive function.

Nonetheless, we are not convinced the remarks rise to the level of plain error. During closing argument, the prosecutor stated: "I think as I recall the testimony—if you don't recall it the same, go with your recollection."[383] Additionally, as previously set forth, the court instructed the jury that the attorneys' argument does not constitute evidence.[384]

Sanders also argues that the prosecutor improperly urged the jurors to discount his mitigating evidence. The Supreme Court has made clear that juries in capital cases must be allowed to consider fully a defendant's mitigating evidence.[385] Also, a defendant is not required to establish a nexus

---

[379] ROA.3158.

[380] ROA.3122.

[381] ROA.3158.

[382] ROA.3158.

[383] ROA.3366.

[384] ROA.3411.

[385] *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007).

between the crime of conviction and the proffered evidence for it to be considered by the jury.[386]

Sanders challenges the following remarks during closing argument, arguing that the prosecutor was urging the jury to disregard particular mitigation evidence. After the prosecutor stated that Sanders had proposed a list of 106 mitigating circumstances on the verdict form, she stated: "[L]et me suggest to you that simply because they may be factually true statements does not mean they are actually mitigating as to the defendant."[387] We reject the contention that this remark is urging the jurors to disregard the mitigating evidence. Right after this remark, the prosecutor said: "You need to assess all of [the mitigating circumstances]. And if the evidence supports them and you find that they somehow point to some reason why the death penalty is not appropriate and life is a better sentence, then you need to consider them."[388] These remarks were not urging the jurors to ignore the mitigating evidence; instead, the prosecutor was telling the jurors that they need to assess all of the mitigating evidence and determine the appropriate penalty.

Sanders makes a similar challenge to the following remark: "So how is that mitigating for the defendant?"[389] The prosecutor asked that question after referencing the evidence regarding Sanders's mother's difficult upbringing. Sanders ignores the remarks made right after that question. The prosecutor states Sanders "didn't grow up that way."[390] The prosecutor then contrasts the relative comforts of Sanders's upbringing compared to the

---

[386] *Tennard v. Dretke*, 542 U.S. 274, 287 (2004).

[387] ROA.3363.

[388] ROA.3363-64.

[389] ROA.3364.

[390] ROA.3364.

hardships endured by his mother. These remarks do not urge the jurors to ignore the mitigation evidence.

Sanders next challenges the following remarks by the prosecutor: "Yes, he has some processing issues. Yes, he has some language issues. None of those stopped him from shooting [L.R.] four times."[391] Again, because there is no objection, we review this claim for plain error. Sanders contends that these remarks urged the jurors to disregard the mitigation evidence unless it provided an excuse for the crime. As previously set forth, we are to read these remarks in the context of the trial. This remark was followed by an extended discussion of Sanders's crime of conviction and specifically the attention, focus, and concentration he would have needed to engage in such conduct.[392] Indeed, in these remarks, the prosecutor specifically referenced the testimony of the government's expert witness, Dr. Bianchini. Read in context, it is clear that the prosecutor was demonstrating that Sanders had a level of executive functioning by pointing to the attention, focus, and concentration he exhibited during the murder of L.R. Therefore, the statement constituted permissible argument.

Finally, Sanders complains the prosecutor improperly argued that L.R. "didn't deserve" what happened to her and that Sanders deserved death.[393] Sanders contends that these remarks improperly urged the jurors to base their decision on passion and prejudice. "Although the prosecution may not appeal to the jury's passions and prejudices, the prosecution may appeal to the jury to act as the conscience of the community."[394] The

---

[391] ROA.3399.

[392] ROA.3399.

[393] ROA.3372.

[394] *Jackson v. Johnson*, 194 F.3d 641, 655 (5th Cir. 1999).

prosecution properly argued from the evidence and Supreme Court precedent that Sanders deserved death.  The Supreme Court has made clear that a "jury must be allowed not only to consider [mitigating] evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly *deserving* of death."[395]  Sanders has failed to show the prosecutor's remarks constituted plain error.

## XI

Sanders next contends that the FDPA[396] operates in an unconstitutionally arbitrary and capricious manner—both generally and as applied to him.[397]  Arguably, if the FDPA were unconstitutional, Sanders might be eligible for a sentence more lenient than a life sentence without possibility of parole.  Therefore, we will proceed to address this issue.

"The constitutionality of a federal statute is a question of law reviewed de novo."[398]  This court has rejected Sanders's argument, holding that the "FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty."[399]  Our precedent precludes Sanders's facial challenge to the FDPA.

With respect to Sanders's as-applied challenge to the FDPA, he contends that he received the death penalty while others did not because of the race of his victims, the admission of unreliable evidence of uncharged

---

[395] *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007) (emphasis added).

[396] 18 U.S.C. §§ 3591-98.

[397] Sanders Br. at 137.

[398] *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004).

[399] *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998).

conduct, and juror confusion.[400] Sanders and L.R. are both white. Sanders's statistically based arguments are analogous to those which the Supreme Court considered and ultimately rejected in *McCleskey v. Kemp*.[401] In that case, the Court addressed whether Georgia's "capital punishment system [was] arbitrary and capricious in application."[402] The petitioner pointed to statistical evidence suggesting racial prejudice impacted capital-sentencing determinations in the state.[403] The Court ultimately dismissed the petitioner's arguments notwithstanding this evidence. It noted that the statistical evidence did not prove that "race was a factor in [the petitioner's] particular case."[404] Recently, in the context of a selective prosecution claim based on race discrimination in a capital case, this court reiterated the Supreme Court's holding in *McCleskey*, stating that "statistical evidence alone does not establish that 'the decisionmakers in his case acted with discriminatory purpose.'"[405]

Like the petitioner in *McCleskey*, Sanders's proffered evidence does not demonstrate that the factors he identified impacted *his* jury's consideration of his sentence. He merely points to statistical evidence purporting to show that improper considerations and juror confusion *can* play a role in sentencing determinations and posits that these factors explain his jury's decision to impose the death sentence.[406] As in *McCleskey*, Sanders's

---

[400] Sanders Br. at 148.

[401] 481 U.S. 279, 308-13 (1987).

[402] *Id.* at 308 (emphasis omitted).

[403] *Id.*

[404] *Id.*

[405] *Broadnax v. Lumpkin*, 987 F.3d 400, 414 (5th Cir. 2021) (emphasis omitted) (quoting *McCleskey*, 481 U.S. at 292).

[406] Sanders Reply Br. at 49.

evidence fails to demonstrate the applicable capital-sentencing regime was arbitrarily and capriciously applied in his case.

Relying on a sampling of capital cases that did not result in a death sentence, Sanders asserts that there is "no consistent, predictable measure for determining which defendants will be spared and which condemned."[407] This argument affords Sanders no relief. The Supreme Court has explained that "the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system."[408]

Sanders also argues that the FDPA's "requirements do little to narrow the eligible pool."[409] This court has rejected the argument that the FDPA is unconstitutional because it fails to narrow significantly the class of offenses to which the death penalty applies.[410] Finally, Sanders also challenges the relaxed evidentiary standards that apply to the penalty phase of the trial, but concedes that the argument is foreclosed by our precedent.[411] Sanders's challenges to the FDPA are without merit.

---

[407] Sanders Br. at 145.

[408] *McCleskey*, 481 U.S. at 311 (alteration in original) (quoting Harry Kalven, Jr. & Hans Zeisel, The American Jury 498 (1966)).

[409] Sanders Br. at 142.

[410] *United States v. Webster*, 162 F.3d 308, 354-55 (5th Cir. 1998).

[411] Sanders Br. at 149-50 (citing *United States v. Fields*, 483 F.3d 313, 337 (5th Cir. 2007)).

No. 15-31114

## XII

Sanders argues that his death sentences are aberrational and disproportionately severe.[412]  As with other of Sanders's arguments, it is unclear whether commutation of his death sentences to life without possibility of parole mooted this issue.

The government contends that Sanders did not raise this claim in the district court, and therefore, that we should review it for plain error.[413] Sanders counters that because this argument does not assert error by the district court, it could not have been preserved below.[414]  The Supreme Court has rejected a similar argument, holding the FDPA "does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme."[415]  We therefore review Sanders's argument for plain error.

The jury found that Sanders had brain damage and that he would not be a danger in prison.[416]  In light of those two findings, Sanders asks this court to conduct a proportionality review of his sentence "compared to those imposed in other federal cases."[417]   This court has explained that a "[p]roportionality review examines the appropriateness of a sentence for a particular crime by comparing the gravity of the offense and the severity of

---

[412] Sanders Br. at 153.

[413] Government Br. at 119-20.

[414] Sanders Br. at 156 n.38.

[415] *Jones v. United States*, 527 U.S. 373, 388-89 (1999); *accord United States v. Aquart*, 912 F.3d 1, 30 (2d Cir. 2018); *United States v. Lee*, 374 F.3d 637, 652-53 (8th Cir. 2004).

[416] ROA.1616, 1626.

[417] Sanders Br. at 153.

the penalty with sentencing practices in other prosecutions for similar offenses."[418] We have recognized that "[a]lthough the [Supreme] Court has upheld capital sentencing schemes requiring proportionality review, the Court has never required such review as constitutionally mandated."[419] Moreover, this court has recognized that the "FDPA is not so lacking in other checks on arbitrariness that it fails to pass constitutional muster for lack of proportionality review."[420] We decline to conduct a proportionality review of Sanders's sentence.

Nonetheless, the FDPA does require this court to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor."[421] Here, every juror considered and made findings as to each of Sanders's 106 proposed mitigating factors.[422] Although the jury unanimously found that Sanders had brain damage,[423] they unanimously rejected the proposition that brain damage or mental illness impaired Sanders's "ability to make a decision or consider alternative courses of action at the time of the crime."[424] In fact, the jurors unanimously found that Sanders did not suffer from any mental illness.[425] The jury did reject numerous proposed mitigating factors. For example, the jurors

---

[418] *United States v. Jones*, 132 F.3d 232, 240 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999).

[419] *Id.*

[420] *Id.*

[421] 18 U.S.C. § 3595(c)(1).

[422] ROA.1636-50.

[423] ROA.1616.

[424] ROA.1617.

[425] ROA.1616.

rejected the proposition that Sanders was remorseful that he killed L.R.[426] The jurors also rejected the proposition that he was capable of redemption.[427] The jury did not find that his brain damage "decreased [his] ability to regulate emotions and motivated behavior."[428]

On the other hand, the jury agreed with some of the proposed mitigating factors. The jury agreed that "Sanders was helpful to the management and tenants at Pacific Mini Storage," where he had been employed.[429] The jury found that Sanders "is a complicated person who is capable of good deeds."[430] The jury found that Sanders's life had value.[431] We agree with the district court's opinion that the jury's findings at the penalty phase "reveal a thoughtful process" and indicate that it "carefully sought a punishment befitting the crime."[432] Importantly, the district court instructed the jury that when determining the sentence, "you must avoid any influence of passion, prejudice or undue sympathy. Your deliberations must be based upon the evidence you have seen and heard . . . and on the law on which I've instructed you."[433] In light of the jury's findings and the district court's instructions, we conclude that Sanders's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

---

[426] ROA.1615.

[427] ROA.1627.

[428] ROA.1618.

[429] ROA.1625.

[430] ROA.1626.

[431] ROA.1627.

[432] ROA.1548 (district court's order denying motion to set aside sentencing verdict based on a claim of improper prosecutorial closing argument).

[433] ROA.3432.

Sanders next argues that the Supreme Court's holding that the Eighth Amendment bars execution of the intellectually disabled should also prevent a death sentence based on his brain damage and mental illness.[434]  We first note that there was no evidence that he was intellectually disabled; in fact, the evidence demonstrated that Sanders had an I.Q. that was somewhat above average.[435]  Further, the jury unanimously found that Sanders did not suffer from a mental illness.[436]  In any event, this court has rejected the argument that the Eighth Amendment bars the execution of a mentally ill person.[437]

Finally, with respect to extending the ban on executions to include individuals with brain damage, this court has stated that such an argument "is foreclosed by the numerous Fifth Circuit precedents rejecting the proposition that the Eighth Amendment prohibits execution of those who have brain problems but are not intellectually disabled."[438]  However, that precedent does not necessarily control the instant case because it involved cases reviewed under the deferential standard of review of the Anti-Terrorism and Effective Death Penalty Act,[439] and this case comes to us on direct appeal.  Nonetheless, we come to the same conclusion.  Sanders contends there is an emerging "national consensus" that a sentence of death for individuals with brain damage is disproportionate.[440]  Citing a poll,

---

[434] Sanders Br. at 159-62 (citing *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)).

[435] ROA.3253 (showing that Dr. Bianchini testified that Sanders "had very good intelligence" with an I.Q. score of 115, and the "average is 100").

[436] ROA.1616.

[437] *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017).

[438] *Shore v. Davis*, 845 F.3d 627, 634 (5th Cir. 2017) (per curiam).

[439] 28 U.S.C. § 2254; *Smith v. Davis*, 927 F.3d 313, 331 (5th Cir. 2019).

[440] Sanders Br. at 161.

Sanders states that the majority of Americans oppose the death penalty for persons who are mentally ill or mentally challenged, and he believes those descriptors "potentially encompass those with brain damage."[441] He also relies on the official positions of two professional organizations—the American Bar Association and the American Psychiatric Association—who oppose the death penalty for those suffering from brain damage. This evidence falls short of what the Supreme Court found persuasive when addressing a similar argument. In *Roper v. Simmons*,[442] the Supreme Court held that the Eighth Amendment categorically prohibited sentencing a defendant to death if he was under the age of eighteen at the time of the offense.[443] Among other evidence, the Court relied on the fact that thirty states had previously prohibited the death penalty for juvenile offenders.[444] The Supreme Court also found persuasive the fact that even in states where juveniles could still be legally sentenced to death, only a few had actually imposed the penalty in the years leading up to the Court's decision.[445] Sanders's proffered evidence fails to demonstrate that a comparative consensus exists for those defendants suffering from brain damage. Sanders has failed to show that his sentences were aberrational or disproportionate.

## XIII

Finally, Sanders contends that he is entitled to relief under the cumulative-error doctrine even if his various arguments do not merit relief

---

[441] Sanders Br. at 161.

[442] 543 U.S. 551 (2005).

[443] *Id*. at 575.

[444] *Id.* at 564.

[445] *Id.* at 564-65.

individually.[446] We disagree. The cumulative-error doctrine "necessitates reversal only in rare instances."[447] As previously discussed, the vast majority of Sanders's arguments were unpersuasive, and those that had some merit did not undermine our confidence in the judgment. We are likewise convinced the cumulative effect of any errors that may have occurred did not "so fatally infect the trial that they violated the trial's fundamental fairness."[448] Sanders's claim for relief pursuant to the cumulative-error doctrine is without merit.

\*   \*   \*

We VACATE the conviction and sentence imposed based on Count Two of the indictment. We otherwise AFFIRM the judgment of the district court.

---

[446] Sanders Br. at 172-73.

[447] *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc).

[448] *Id.* (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)).

No. 15-31114

Andrew S. Oldham, *Circuit Judge*, concurring:

## I

For no apparent reason, Thomas Steven Sanders shot Suellen Roberts in the head from point-blank range. He did so in front of her 12-year-old daughter, L.R.

Then Sanders turned his violence to L.R. According to Sanders himself, the girl "was in hysterics. She was in hysterics." ROA.2179. Sanders kidnapped L.R. After holding her for three or four days, Sanders shot L.R. in the back of the head. But the girl did not die. So Sanders shot her *two more times* in the head. But still the girl did not die. So Sanders shot her in the chest. Yet again, the girl did not die. Finally, Sanders took a homemade knife and slit the girl's throat "so violently that the marks were on the bones of her neck." ROA.2438. Finally, she died. Sanders dumped L.R.'s body in the woods of Louisiana, where it started decomposing in the late summer heat. Hunters eventually found the girl's corpse weeks later.

A jury of Sanders's peers convicted him and imposed the death penalty for his sadistic crimes.

On the eve of Joe Biden's departure from office, however, the White House[1] decided that Sanders deserved the ultimate act of executive grace: Sanders's death sentence was commuted.

---

[1] Questions have arisen about the flurry of last-minute pardons issued by the Biden Administration. "Overall, Biden granted 4,245 acts of clemency during his four-year tenure in the White House. That far exceeds the total of any other president since the beginning of the 20th century, including Franklin D. Roosevelt, who granted 3,796 such acts during his 12 years in office." John Gramlich, *Biden Granted More Acts of Clemency Than Any Prior President*, Pew Rsch. Ctr. (Feb. 7, 2025), https://www.pewresearch.org/short-reads/2025/02/07/biden-granted-more-acts-of-clemency-than-any-prior-president [https://per-

No. 15-31114

## II

## A

To understand the nature and purposes of the pardon power, we must turn to history. As Chief Justice Marshall put it nearly 200 years ago:

> [T]his power had been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.

*United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160 (1833).

The history of the pardon power is august. The power's roots reach back to Mosaic, Greek, and Roman law. William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 WM. & MARY L. REV. 475, 476 (1977). The pardon prerogative likely first appeared in the Anglo-Saxon legal system in laws enacted around 700 A.D. during the reign of King Ine of Wessex. Stanley Grupp, *Some Historical Aspects of the Pardon in England*, 7

---

ma.cc/592P-TGS5]. At least one was issued by mistake. *See* Ethan Fry, *Blumenthal: "Someone Dropped the Ball" on Biden Granting CT Accused Killer Adrian Peeler Clemency*, CONN. POST (Jan. 23, 2025, 1:57 PM), https://www.ctpost.com/news/article/biden-peeler-bridgeport-killer-clemency-blumenthal-20048813.php [https://perma.cc/2QR2-UYVA]. Some or all were allegedly effectuated via autopen. *See* Meredith McGraw & Annie Linskey, *Trump Lays Groundwork for Investigating People Pardoned by Biden*, WALL ST. J. (Mar. 17, 2025, 5:12 PM), https://www.wsj.com/politics/policy/trump-lays-groundwork-for-investigating-people-pardoned-by-biden-73ee33ad [https://perma.cc/26FR-7KFK]; *cf.* Tim Hains, *The Moment Speaker Mike Johnson Knew Biden Wasn't "In Charge" Anymore*, REALCLEARPOLITICS (Jan. 19, 2025), https://www.realclearpolitics.com/video/2025/01/19/when_mike_johnson_knew_joe_biden_wasnt_in_charge_anymore.html [https://perma.cc/AQT8-D9A7] (Mike Johnson, Speaker of the House of Representatives, stated that President Biden "genuinely did not know what he had signed" in at least one instance toward the end of his presidency).

No. 15-31114

Am.J. Legal Hist. 51, 53 (1963). One law, for example, provided: "If any one fight in the king's house, let him be liable in all his property, and be it in the king's doom[2] whether he shall or shall not have life." 1 Benjamin Thorpe, Ancient Laws and Institutes of England 46 (1840). Another similarly gave the king the power to "be merciful" to one who refused to turn in a thief by exempting him from the otherwise prescribed punishment. *Id.* at 54. During the rule of several subsequent kings, similar laws were enacted concerning additional offenses. *See* Duker, *supra*, at 477. The strength of the king's pardon power further increased under William the Conqueror, who "brought from Normandy the view that clemency was an exclusive privilege of the king." *See* Grupp, *supra*, at 55. Several centuries later, in 1535, Parliament formally gave King Henry VIII the "whole and sole power and authority" to pardon. Duker, *supra*, at 487 (quoting Act for Continuing Certain Liberties in the Crown, 27 Hen. 8, c. 24, cl. 1 (1535)).

Though broad, the king's power to pardon was not unlimited. For example, in 1389, Parliament legislated that "no pardon for treason, murder, or rape, shall be allowed, unless the offence be particularly specified therein; and particularly in murder it shall be expressed, whether it was committed by

---

[2] The word "doom" traces to the "earliest known event in Anglo-American legal history," King Aethelbert's promulgation of laws in 602 or 603 A.D. A.W.B. Simpson, *The Laws of Ethelbert*, *in* On the Laws and Customs of England: Essays in Honor of Samuel E. Thorne 3, 3 (Morris S. Arnold et al. eds., 1981). Aethelbert's laws begin: "These are the dooms which Aethelbert established." *Id.* at 5. Although "doom" is the common translation for the word *domas*, in truth *domas* "is almost untranslatable." *Ibid.* As Brian Simpson explained, the "nearest equivalent is 'judgments.'" *Ibid.* But that calls to mind the modern distinction between legislation and adjudication, a distinction that "was not part of the intellectual stock of ideas of the seventh century." *Ibid.* Instead, the *domas* were "a set of judgments pronounced by a king (and his council of elders) who did not think there was any critical difference between" adjudication and legislation. *Ibid.* (citing Bede, Historia Ecclesiastica Gentis Anglorum 150 (731) (translating *cum consilio sapientum* as "with the advice of wise men")).

lying in wait, assault, or malice prepense." 4 WILLIAM BLACKSTONE, COMMENTARIES *400 (citing 13 Rich. 2, stat. 2, c. 1). As "sir Edward Coke observe[d]," it "was not the intention of the parliament that the king should ever pardon murder under these aggravations." *Ibid.* Indeed, Parliament "did not conceive it possible that the king would ever excuse an offence by name, which was attended with such high aggravations." *Ibid.* Another limit on the pardon power was the "general rule, that, wherever it may reasonably be presumed the king is deceived, the pardon is void." *Ibid.* The same is true when "the king was misinformed" because "any suppression of truth, or suggestion of falshood, in a charter of pardon, will vitiate the whole." *Ibid.*

B

The Framers explicitly "adopt[ed]" the king's traditional pardon power into the Constitution. *Wilson*, 32 U.S. (7 Pet.) at 160. Article II provides that the President "shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. CONST. art. II, § 2, cl. 1. The Founders referred to this power as the "prerogative of mercy." *E.g.*, James Iredell, *Answers to Mr. Mason's Objections to the New Constitution* (1788), *reprinted in* PAMPHLETS ON THE CONSTITUTION OF THE UNITED STATES 333, 354 (Paul Leicester Ford ed., 1888); *see also Ex parte Wells*, 59 U.S. (18 How.) 307, 311 (1856) ("A pardon is said by Lord Coke to be a work of mercy . . . ." (citation omitted)).

As in England, the American pardon power appears to encompass at least five different types of clemency. *See* Daniel T. Kobil, *The Quality of Mercy Strained: Wresting the Pardoning Power from the King*, 69 TEX. L. REV. 569, 575 (1991) (listing five types). But only two are relevant here. A full pardon "relieve[s] the petitioner from *all* penalties and disabilities attached to the offence." *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 381 (1867) (emphasis added). A commutation, on the other hand, was historically considered a kind

of "conditional pardon." *E.g.*, *Ex parte Wells*, 59 U.S. (18 How.) at 308. Because "the king," or the President, could "extend his mercy upon what terms he pleases," he could "annex to his bounty a condition." Blackstone, *supra*, at *401. A common condition offered for a pardon was a lesser punishment. *E.g.*, Conditional Pardons, 1 Op. Att'ys Gen. 482, 482–83 (1821).

## C

For the Founders, the pardon power had two primary purposes. Each purpose, in turn, had two specific exemplars.

## 1

First and foremost, the Founders thought the pardon power was necessary to secure justice for those convicted of crimes despite being legally or morally innocent. In the words of Alexander Hamilton, "without an easy access to exceptions in favour of unfortunate guilt, justice would wear a countenance too sanguinary and cruel." The Federalist No. 74, at 385 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001).

Start with legal innocence. Suppose "a man in reality innocent, but with strong plausible circumstances against him," was "convicted upon very slight and insufficient proof." Iredell, *Answers to Mr. Mason's Objections*, *supra*, at 353. It would be "unjust and unreasonable to exclude all means of mitigating punishment" in such a circumstance. 3 Joseph Story, Commentaries on the Constitution of the United States § 1488 (1833). The prerogative of mercy was thus deemed an essential means of securing justice in this context.

Now consider moral innocence. As Joseph Story explained, sometimes "the law may be broken, and yet the offender be placed in such circumstances, that he will stand, in a great measure, and perhaps wholly, excused

in moral and general justice, though not in the strictness of the law." *Ibid.* In such a case, a pardon was necessary "to soften the rigour of the general law." Blackstone, *supra*, at *397; *accord* Lon L. Fuller, *The Case of the Speluncean Explorers*, 62 Harv. L. Rev. 616, 619 (1949) (arguing, as Chief Justice Truepenny, that a pardon was appropriate for those who killed to save their own lives "to mitigate the rigors of the law."). In sum, the "man" might have "offend[ed] against the letter of the law," but he was "entitle[d] . . . to mercy." James Iredell, *Address in the North Carolina Ratifying Convention*, *reprinted in* 4 The Founders' Constitution 17, 17 (Philip B. Kurland & Ralph Lerner eds., 1987). The pardon was the means of mercy.

2

The Framers saw a second primary purpose for the pardon power beyond ensuring justice and mercy to the legally or morally innocent. That purpose was promoting the public interest. Once again, this purpose had two core exemplars.

The first was to quell rebellions and preserve peace. "[I]n seasons of insurrection or rebellion," Hamilton explained, "there are often critical moments, when a well-timed offer of pardon to the insurgents or rebels may restore the tranquility of the commonwealth." The Federalist No. 74, *supra*, at 386. Or as James Iredell put it, with the use of a pardon "at a critical moment, the President might, perhaps, prevent a civil war" and bring about "peace." Iredell, *Address in the North Carolina Ratifying Convention*, *supra*, at 18.

As usual, the Founders were quite prescient. In 1795, President Washington used the pardon power to restore peace after the Whiskey Rebellion in Pennsylvania. Kobil, *supra*, at 592. Likewise, Abraham Lincoln and Andrew Johnson used the pardon power during and after the Civil War to restore national tranquility. *Id.* at 593.

The second core way in which the pardon power was meant to further the public interest was by helping "obtain the testimony of accomplices." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 426 (Max Farrand ed., 1911) (statement of James Wilson). "[I]t is often necessary to convict a man by means of his accomplices." Iredell, *Address in the North Carolina Ratifying Convention*, *supra*, at 18. By offering a pardon to less culpable offenders, the President might secure "the evidence of accomplices" and thereby "bring great offenders to justice." *Ibid.*

## III

It is hard to see how the Biden Administration's midnight pardon of Sanders—or any of the other 36 pardoned murderers—fits with the history and tradition of the pardon power. Sanders is not legally or morally innocent. Far from it. Nor did pardoning him serve any public interest, let alone help quell a rebellion or obtain his testimony in order to convict an even worse criminal. Sanders acted alone when he murdered Ms. Roberts, when he kidnapped her 12-year-old daughter, when he murdered the girl, and when he unceremoniously dumped her body in the woods of Louisiana to rot. This pardon is a stain on the noble prerogative of executive mercy.